THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID J. BATAC, Defendant-Appellant.

Second District   No. 2—92—0577

Opinion filed March 24, 1994.—Rehearing denied April 26, 1994.

416

Patrick G. Reardon, Carl P. Clavelli, and Mark W. Solock, all of Chicago, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

The defendant, David Batac, was charged by indictment with first-degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2) (now codified, as amended, at 720 ILCS 5/9—1(a)(1), (a)(2) (West 1992))), and conspiracy to commit first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 8—2 (now codified, as amended, at 720 ILCS 5/8—2 (West 1992))) in the death of Anthony Fioti, Sr., who was fatally shot by a crossbow and arrow outside his Villa Park home. Prior to trial, the conspiracy count was dismissed on a motion of the State. Following unsuccessful motions by the defendant to have a search warrant and his statements suppressed, the matter proceeded to a jury trial. The defendant was found guilty of first-degree murder and sentenced to 45 years in prison. Following unsuccessful post-trial motions for a new trial and reduction of his sentence, the defendant timely filed this appeal. We affirm.

Officer James Orlowski of the Villa Park police department testified at trial that he responded to a reported shooting at 204

South Myrtle, Villa Park, shortly after midnight on July 18, 1990, where he discovered the victim lying on the sidewalk near the back porch of the residence. The victim was bleeding and in pain from two wounds in his back and stomach. Orlowski said the victim told him that he had been shot with an arrow and that he pulled the arrow out of his body before the officer arrived. The victim said he was shot while standing on his back porch and that he saw his assailant standing in a garden area directly west of his porch. The victim told Orlowski that he needed blood and oxygen. Orlowski found an arrow that apparently was used in the attack immediately west of where the victim was lying. Orlowski noticed that vegetation in the garden area was trampled.

Officer John Szkolka of the Villa Park police department testified that he also responded to the reported shooting and functioned as backup to Orlowski. Szkolka said he spoke with the victim, who told him that he knew who attacked him but that he would tell the officer the assailant's name later. Szkolka rode with the victim to Loyola Hospital, where the victim died soon after arriving. The victim did not name his assailant before dying. Barbara Fioti, the victim's wife, was present at the scene of the shooting when Orlowski arrived. She was also indicted for first-degree murder and conspiracy in this matter, but she was tried separately, and her case is not part of this appeal.

Officer Raymond Fisher of the Villa Park police department testified at trial that he was assigned to execute a search warrant at the defendant's home at 523 North Craig, in Lombard, on July 31, 1990. Fisher was accompanied by three other officers from the Villa Park police department, a uniformed Lombard officer, and Assistant State's Attorney John Elsner. Fisher said he found some letters, a telephone address book, and two photographs. He also found two receipts in a garbage can in the upstairs bathroom, one of which had Barbara Fioti's name written on it and the other bearing the defendant's name. Fisher said he then searched a second bedroom, where he found some torn receipts and items from a mortgage company. Fisher said he also recovered some photos and a manual titled ABCs of Bow Hunting and a copy of Bear Archery '89 magazine. Fisher said he also found an owner's manual for a Bear and Jennings compound crossbow and instructions for the assembly of a devastator front sight for a compound bow. Fisher also found a letter that linked the defendant and Barbara Fioti romantically.

Detective Scott Schroeder of the Villa Park police department testified that he was present when the defendant was arrested and that the defendant was read his *Miranda* warnings (*Miranda v.*

*Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) at that time. Schroeder said that when the defendant arrived at the police station, he was searched and again read the *Miranda* warnings. Schroeder said that on the morning of August 1, 1990, he and Assistant State's Attorney Elsner drove the defendant to the Cal-Sag Canal on U.S. 45, where the defendant claimed he had discarded his crossbow. The item was found there and taken as evidence.

Detective Ralph North of the Villa Park police department testified that the defendant told him he followed the victim for about one month prior to the fatal attack and watched his movements. North said the defendant told him he only wanted to scare Anthony Fioti, intending to wound him but not to kill him.

Detective Sergeant Dennis Lewis of the Villa Park police department testified that he spoke with the defendant shortly after he was arrested on the evening of July 31, 1990. Lewis said the defendant claimed he had nothing to do with the attack and wondered who planted the incriminating evidence found in his home. Lewis said the defendant asked if he could see Barbara Fioti, who was at the police station at the time. Barbara Fioti was brought into the room where the defendant was being held. Lewis said Barbara Fioti told the defendant to tell the truth; then she collapsed in his lap. Paramedics were called to treat her.

Assistant State's Attorney Elsner testified that he was involved in the questioning of the defendant on the day the defendant was arrested, July 31, 1990, and that the defendant initially denied knowledge of the shooting. Elsner said that at about 9:20 that night he was informed that the defendant wanted to make a statement. Elsner said the defendant consented to having the statement taped. The tape of the statement was played for the jury at trial.

In his taped statement, the defendant stated that he had known the victim for about two years and that he had a romantic relationship with Barbara Fioti. The defendant said he did not intend to kill Anthony Fioti, but wanted to "warn" him in an attempt to keep Anthony Fioti from physically abusing Barbara Fioti. The defendant said the abuse by Anthony Fioti against his wife was severe and increased over a period of months to a point that the defendant became worried that, if he did not intercede, Barbara Fioti would commit suicide in despair. The defendant said that Barbara Fioti often took sleeping pills to escape the trauma of abuse by her husband. The defendant said he bought a crossbow because he did not want to handle a gun or rifle. The defendant said he did not confront Anthony Fioti directly because he believed Fioti carried a gun and was a member of a motorcycle gang. On the night he shot

Anthony Fioti, the defendant said he followed Fioti to a location thought to be a gang hangout, then drove to the Fioti home to check on Barbara Fioti. When Anthony Fioti came home, the defendant said he took a position in a garden behind the back porch of the Fioti home and aimed the crossbow at Fioti. The defendant said his knees buckled and the crossbow discharged accidentally; the arrow struck Fioti. The defendant said he then left the location and disposed of the crossbow in a river a few days later.

Following Elsner's testimony and the playing of the defendant's taped statement in open court, the State offered several stipulations and then rested its case in chief. The defendant moved for a directed verdict of acquittal, which was denied.

The defendant did not testify at trial. His father, James Batac, testified that the defendant lived with him at the 523 North Craig residence in Lombard for his entire life except for two years after high school. He also testified that, when the defendant was in high school, he had surgery on both of his knees. Following about seven hours of deliberations, the jury returned a verdict of guilty of first-degree murder. Following a sentencing hearing, the trial court sentenced the defendant to 45 years in prison, and this appeal followed.

On appeal the defendant contends that the trial court committed reversible error when it: (1) denied his motion to quash the search warrant for his and Barbara Fioti's homes; (2) refused to suppress statements made by him that were extracted by authorities in contravention of his constitutional right to remain silent; (3) barred him from producing evidence at trial that would have corroborated certain portions of his taped statement and provide a context for the jury to consider whether his actions in shooting the victim were reckless rather than intentional; and (4) permitted the State during its rebuttal closing statement to present argument that nullified a jury instruction on a lesser-included offense. For the following reasons, we find none of these allegations meritorious.

## SEARCH WARRANT

The defendant first claims that the trial court should have quashed the warrant to search his and Barbara Fioti's homes because the warrant lacked specificity and was not supported by probable cause. The trial court determined following a hearing that sufficient probable cause existed to support the search warrant, and thus the defendant's motion to suppress was denied. On appeal, the defendant must show that this determination was manifestly erroneous. (*People v. Galvin* (1989), 127 Ill. 2d 153, 162; *People v. Galdine* (1991), 212 Ill.

App. 3d 472, 478.) The trial court's determination, which was set out in a three-page letter to counsel, carefully weighed the matter and the relevant case authority in reaching its determination. We believe the trial court properly denied the defendant's motion.

Probable cause to support a search warrant is found in a *probability* of criminal activity, not a *prima facie* showing, (*People v. Stewart* (1984), 104 Ill. 2d 463, 475-76), taking into account the "totality-of-circumstances" of the particular case. (*People v. Tisler* (1984), 103 Ill. 2d 226, 245-46.) Affidavits or evidence presented in support of the warrant are tested and interpreted in a commonsense and realistic manner. (*People v. Parker* (1968), 42 Ill. 2d 42, 45.) Courts that review a determination of probable cause are not to be unduly technical, but must consider the probabilities based on practical considerations of everyday life. *People v. Thomann* (1990), 197 Ill. App. 3d 488, 495.

The United States and Illinois Constitutions, as well as Illinois legislation and case law, require that a search warrant be supported by probable cause and describe with particularity the place to be searched and the persons or things to be seized. (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; Ill. Rev. Stat. 1989, ch. 38, par. 108—7 (now 725 ILCS 5/108—7 (West 1992)).) Our supreme court has held that the probable cause requirement for a search warrant has two dimensions: facts must be related that would cause a reasonable person to believe that a crime has been committed, and those facts must lead a reasonable person to believe that evidence of the crime will be found in the place to be searched. (*People v. Wolski* (1980), 83 Ill. App. 3d 17, 21.) The degree of particularity required must be determined on a case-by-case basis (*People v. Allbritton* (1986), 150 Ill. App. 3d 545, 547) and depends on the nature of the case and the material or items to be seized. *People v. Casillo* (1981), 99 Ill. App. 3d 825, 828.

A minute and detailed description of the property to be seized is not required in an affidavit seeking a warrant, "but the property must be so definitely described that the officer making the search will not seize the wrong property." (*People v. Prall* (1924), 314 Ill. 518, 523; see also *Allbritton*, 150 Ill. App. 3d at 546-47.) A general description of items to be seized is inappropriate if the investigating authorities have a specific description available to them. (*People v. Mitchell* (1978), 61 Ill. App. 3d 99, 102-03.) Additionally, a general description will not suffice when items to be seized will impact a first amendment right, as when books and other papers are sought in an effort to determine whether the ideas or opinions expressed in those books and papers may form the basis of a criminal complaint. *Stan-*

*ford v. Texas* (1965), 379 U.S. 476, 485, 13 L. Ed. 2d 431, 437, 85 S. Ct. 506, 511-12; *People v. Rixie* (1989), 190 Ill. App. 3d 818, 828.

■ A review of the affidavit in support of the search warrant in the present matter discloses that there was sufficient specificity to permit the executing officers to search only for clearly identified, relevant material and to avoid an improper rummaging through the defendant's and Mrs. Fioti's homes. The materials sought, despite the defendant's contention on appeal, were not so vaguely described or open-ended as to constitute a "wish list" used by investigators on a fishing expedition for relevant information.

The search warrant in the present matter was issued by an associate judge on July 30, 1990, on the strength of a six-page affidavit sworn by Officer Robert Deevey, a detective for the Villa Park police department. Deevey's affidavit detailed the particulars of the shooting of Anthony Fioti. Deevey began his investigation the night of the shooting. He said Barbara Fioti told him that her husband had always given her his paycheck to pay the bills of the home but that, in the last two weeks, he had stopped giving her any money, removed all of their money from the family checking and savings accounts, and opened a new account.

Deevey said he found a bank book and deposit slips in Anthony Fioti's truck, showing that he had recently opened a new account and made a $10,000 deposit. Deevey said that Barbara Fioti denied having an extramarital affair.

Deevey also declared in the affidavit that about five days after the shooting he spoke with a co-worker of Barbara Fioti's, who told him that Barbara Fioti was having an "open relationship" with a man named David J. Batac. She had seen the two "necking," and the defendant often came to their place of business to have lunch with Barbara. The co-worker also told Deevey that Barbara Fioti complained on several occasions that her husband beat her. Deevey said the co-worker told him that the defendant declared on one occasion that he "wanted to kill Tony Fioti." The co-worker also said that Barbara Fioti often said she wished "Tony was dead" and that she "wanted to kill him."

Deevey also spoke to realtor Randy Stob, who told him he executed a contract for purchase of a home in Lombard by the defendant and Barbara Fioti.

Deevey's affidavit also included a physical description of the places where the warrant would be executed and sought "correspondence relating to the crimes between Barbara Fioti and David J. Batac or other unknown parties; bank records; archery equipment or any documentation relating to its use; evidence of any financial

transactions including real estate contracts, life insurance policies, will [*sic*], power of attorney, trust agreements; and romantic correspondence between Barbara Fioti and David Batac," plus other diaries or journals of the defendant, Barbara Fioti, and her two children.

The trial court found a reasonable basis for including these items in the warrant. We agree. It is logical that the information sought might be in the defendant's and/or Barbara Fioti's home. Information relating to archery is obviously relevant to the commission of the crime. Love letters and similar correspondence between the defendant and Mrs. Fioti were relevant to motive. Bank records related information that Mrs. Fioti and the victim were separating, further evidence of motive. The contract for purchase of a home by the defendant and Barbara Fioti was further evidence of a relationship between them and, thus, of motive. Finally, there was nothing seized which impacted on the defendant's first amendment rights.

The defendant further claims that evidence seized from his home, the 523 North Craig residence, should be suppressed because nowhere in the affidavit supporting the warrant is there any mention that the Craig residence is the defendant's home. This claim is meritless. The defendant does not deny, and did not in the circuit court, that the 523 North Craig residence is his home. His claim on appeal is hypertechnical, that the affidavit must contain some specific notation about the home, though the defendant cites no authority for this proposition. As we have noted, courts are specifically not to look at affidavits in a hypertechnical way but, rather, must make a commonsense determination from all relevant information and circumstances. (*Stewart*, 104 Ill. 2d at 475-76; *Tisler*, 103 Ill. 2d at 245.) We believe the record is more than sufficient to indicate that the court which issued the warrant was well aware that 523 North Craig was the defendant's home.

We note also that the affidavit which supported the search warrant included as an appendix a copy of the residential sales contract that the defendant and Mrs. Fioti filled out when they viewed the Lombard property they were considering buying. That agreement lists 523 North Craig as the current residence of both the defendant and Mrs. Fioti.

The defendant argues on appeal that this contract was insufficient to connect him with 523 North Craig because the document was not signed or otherwise acknowledged and, thus, was mere hearsay. However, "[h]earsay evidence alone can be a sufficient basis to establish probable cause, so long as there is a substantial basis for crediting the hearsay." (*People v. Francisco* (1970), 44 Ill. 2d 373, 375.) We

believe there was sufficient connection between the alleged crime and the 523 North Craig residence.

## THE DEFENDANT'S POST-ARREST STATEMENTS

The defendant's second claim, also unavailing, is that the trial court erred when it found that his post-arrest statements were admissible at trial. The defendant admits that the investigating officers advised him of his *Miranda* rights, but he claims that they engaged in an impermissible "intense and purposeful interrogation technique carefully calculated to overcome the procedural protection mandated" by *Miranda* and its progeny.

A confession is obtained illegally and must be suppressed at trial when it results from custodial interrogation that is conducted after the defendant indicates in any manner either prior to or during questioning that he or she wishes to remain silent or to speak with an attorney prior to questioning. (*People v. Henenberg* (1973), 55 Ill. 2d 5, 10-11, interpreting *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) Our supreme court has determined that the State may demonstrate that the accused voluntarily waived his *Miranda* rights through "[a]ny clear manifestation of a desire to waive." (*People v. Higgins* (1972), 50 Ill. 2d 221, 227.) The court in *Higgins* made it clear that no "express, formalistic waiver" was necessary, but courts should examine what the accused says and the surrounding facts and circumstances. *Higgins*, 50 Ill. 2d at 227.

Thus, a statement is made voluntarily when, after considering the totality of the circumstances, it is given freely, voluntarily and without compulsion or inducement. (*People v. House* (1990), 141 Ill. 2d 323, 376.) Conversely, a statement is involuntary, and thus subject to suppression, when the defendant's will is overcome at the time he confesses. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 117.) "Factors to consider when making a determination of voluntariness include the age, education and intelligence of the accused, the length of the detention and the duration of the questioning, whether the accused was advised of his constitutional rights, and whether the accused was subjected to any physical mistreatment." (*House*, 141 Ill. 2d at 376, citing *People v. Terrell* (1989), 132 Ill. 2d 178, 198; *People v. Martin* (1984), 102 Ill. 2d 412, 427.) The question of competency of a confession "is for the trial court alone to decide by a preponderance of the evidence." (*House*, 141 Ill. 2d at 376.) The trial court's determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *People v. Redd* (1990), 135 Ill. 2d 252, 292-93.

In the present matter the trial court took these *House* factors

into account and determined that the defendant's taped statement was properly obtained. Our review of the record convinces us that this was the correct conclusion considering the totality of the circumstances.

Lt. Ronald Ohlson admitted during the suppression hearing that when he spoke to the defendant at 8:30 on the night of his arrest, the defendant indicated that he did not wish to make a statement. Therefore, the defendant invoked his right to remain silent, and questioning had to cease. Lt. Ohlson did stop his questioning at that time and left the defendant alone in a police interrogation room. However, officers returned at 9:15 p.m. and attempted to resume questioning the defendant. Thus, our inquiry is whether that renewed interrogation was improper because the defendant had earlier invoked his right to remain silent.

The United States Supreme Court has determined that there is no *per se* rule barring the renewal of questioning by police following a defendant's initial invocation of his right to remain silent. (*Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321.) Statements made by a defendant who had earlier invoked his right to remain silent are admissible if police "scrupulously honor[ ]" the defendant's right to "cut off questioning." (*Mosley*, 423 U.S. at 104, 46 L. Ed. 2d at 321, 96 S. Ct. at 326.) The factors to be considered when determining whether the right to cut off questioning had been honored include whether a significant amount of time elapsed between interrogations, whether a fresh set of *Miranda* warnings prefaced the renewed questioning, and whether the questioning involves a matter unrelated to the subject of the first interrogation. (*Mosley*, 423 U.S. at 104-05, 46 L. Ed. 2d at 321-22, 96 S. Ct. at 327; *People v. Easley* (1992), 148 Ill. 2d 281, 303-04.) Our supreme court has held that police may, consistent with *Mosley*, renew questioning on the same subject as was previously cut off by the defendant. *People v. Foster* (1987), 119 Ill. 2d 69, 86-87, *cert. denied* (1988), 486 U.S. 1047, 100 L. Ed. 2d 628, 108 S. Ct. 2044; *People v. Balderas* (1993), 241 Ill. App. 3d 845, 853.

■ Our review of the record convinces us that the renewed questioning of the defendant was proper under *Mosley*. Officer Ohlson cut off his questioning immediately after the defendant invoked his right to remain silent and left the interrogation room. The renewed questioning followed 45 minutes later, which gave the defendant time to determine whether he wished to speak with the officers. He was not repeatedly badgered by the officers. Additionally, the defendant was given a fresh set of *Miranda* warnings before the renewed questioning.

There was conflicting evidence during the suppression hearing on the further issues of whether the defendant ever asked to speak with an attorney and whether he again invoked his right to remain silent after the 8:30 p.m. occasion.

The defendant testified that although he signed a *Miranda* waiver card, he wanted to speak with an attorney and claimed that he told the officers present that he wished to remain silent. State's Attorney Elsner testified that the defendant never invoked his right to remain silent or to speak with an attorney, but merely stated that the defendant had previously spoken to his father, who indicated that he might need a lawyer. Elsner said he told the defendant that he could not provide him with legal advice and that the defendant would have to decide for himself whether to give a statement or speak with an attorney. Elsner said he then left the interrogation to give the defendant time alone to consider whether to ask for an attorney. Some time later, Elsner said, he was informed that the defendant was ready to make a statement. That statement, which was tape recorded, was offered into evidence at trial and is the subject of this appeal.

The trial judge, as the trier of fact, had the sole responsibility to weigh the credibility of the witnesses and the conflicting testimony, and that determination will not be overturned on review absent an abuse of discretion by the trial court. (*People v. Janis* (1990), 139 Ill. 2d 300, 308; *People v. Alewelt* (1991), 217 Ill. App. 3d 578, 580.) The court made specific findings that the defendant is an intelligent adult with two years of college, that he was not mistreated in any way by interrogating officers after his arrest, and that he was given his *Miranda* warnings immediately after his arrest.

The court declared it was "not persuaded that defendant was tricked into making a statement by [Barbara] Fioti's appearance and collapse into his lap. *** Considering all of the facts and circumstances, the Court finds the defendant's will was not overborne and his statements were voluntary." This was a reasonable finding.

The court also determined that Elsner's response to the defendant's questions as to whether he needed an attorney was appropriate. We agree. Elsner properly told defendant that he could not advise him and allowed the defendant time to consider whether he wanted to speak with an attorney before Elsner resumed questioning.

As the trial court correctly pointed out: "While it is true that request for counsel need not be explicit and unmistakably clear, not every reference to an attorney constitutes an invocation of one's right to counsel. Here, there was nothing more than indecision." This correctly states the law and is a reasonable finding based upon the facts in this case. The trial court's decision not to suppress the defendant's taped statement was not manifestly erroneous.

### CHARACTER EVIDENCE

The defendant next claims that reversible error was committed when he was prevented from introducing at trial evidence of the victim's bad character to bolster his claim that he acted recklessly when he shot the victim and to corroborate portions of his statement to police following his arrest. Neither basis for admitting the bad character evidence is valid; thus, the defendant's claim is unavailing.

Prior to trial, the court granted the State's motion *in limine* to preclude the defendant from offering evidence of the victim's character. Evidence is relevant, and therefore admissible, if it tends to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. (*People v. Seuffer* (1991), 144 Ill. 2d 482, 509.) The trial court has within its discretion the right to exclude evidence that is collateral to a material issue. (*People v. Renslow* (1981), 98 Ill. App. 3d 288, 293-94.) The determination of admissibility of collateral evidence offered to affect the credibility of a witness is a matter within the sound discretion of the trial court, and its determination will not be disturbed on appeal absent an abuse of that discretion. *People v. Printy* (1992), 232 Ill. App. 3d 735, 745.

The defendant first claims that, had he been permitted to offer this evidence, it would have bolstered his claim that he acted recklessly in shooting the victim. This contention, if believed by the jury, would have resulted in his conviction of the lesser offense of involuntary manslaughter. The defendant requested, and the trial court gave, the involuntary manslaughter instruction based on evidence produced by the State from which the jury could find the defendant acted recklessly.

That evidence came as part of the tape-recorded inculpatory statement the defendant gave to police following his arrest. The relevant passage involved the defendant describing the moments immediately preceding the shooting:

> "Um, as I stood up I started losing my balance because I was just worried that he [the victim] was gonna see me and worried if he had the 38 [caliber handgun] on him. He had a better shot of me than I did of him and I was just looken [*sic*] to wound him in the leg or something. Uh, as I stood up I had it [the crossbow] where my finger was still holding everything and then when I got up to get around my knee gave out 'cause I have 2 bad knees. When my one right knee gives out every once in awhile, and just from being nervous, my knee gave out. I fell forward at the time. I pulled the thing [trigger]."

Thus, the defendant's position was that he was pointing the

loaded crossbow at the victim, which he admits was a reckless act under applicable case law (*People v. Andersch* (1982), 107 Ill. App. 3d 810, 818), and that the bow discharged when he accidentally pulled the trigger. On appeal, the defendant claims that because he was not able to offer evidence of the victim's bad character, he was unable to bolster this claim of recklessness. Significantly, the defendant does not explain what possible relevance the victim's bad character would have to his claim of recklessness. The defendant claims in his brief that the "barred evidence would have provided the jury with a context for evaluating that portion of the defendant's statement which explained the shooting as an accidental or reckless act." What this "context" is we are left to guess at. We believe the relevance of the victim's bad character to the recklessness claim by the defendant is, at best, extremely tenuous. Perhaps the fact that the victim was apparently the member of a motorcycle gang, carried a gun, and beat his wife might help explain why the defendant was afraid to confront his girlfriend's tormentor directly. Perhaps this evidence would lend credence to the defendant's claim that his knees became weak at the fateful moment. However, this hardly requires a finding that it was an abuse of discretion for the trial court to refuse to admit this evidence at trial.

Relevant evidence may be excluded at the trial court's discretion if its probative value is substantially outweighed by its prejudicial effect. (*People v. Eyler* (1989), 133 Ill. 2d 173, 218.) The supreme court in *Eyler* noted that "prejudice means 'an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror.'" (*Eyler*, 133 Ill. 2d at 218, quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 403.1 (4th ed. 1984).) In the present matter, it would have been improper for the trial court to permit bad character evidence to support the recklessness claim because it would have invited the jury to base its decision on "hatred, contempt or horror" of the victim.

Similarly, what relevance the victim's bad character had to the defendant's credibility was sufficiently tenuous that it, too, was properly excluded. The defendant claims that because the State argued to the jury that he lied to investigators, he was entitled to offer evidence of the victim's bad character because it would prove that some of what the defendant said in his taped statement—namely, that the victim was a dangerous person—was true. However, merely because the defendant told the truth about some aspects of the shooting incident does not mean he did not lie about other aspects.

Even assuming, *arguendo*, that the defendant should have been

permitted to offer the bad character evidence, we are not required to reverse his conviction unless the error casts a serious doubt on the defendant's guilt. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43.) This is not a close factual case. The evidence of the defendant's guilt as to first-degree murder was formidable. The evidence that the defendant acted recklessly paled by comparison.

We note that evidence of a victim's aggressive and violent character is admissible when the defendant has raised a theory of self-defense because such evidence is relevant to show that the victim was the aggressor. (*People v. Lynch* (1984), 104 Ill. 2d 194, 200.) However, it is clear that in this case the defendant could not raise a claim of self-defense because there was no evidence that the victim ever saw, much less threatened, the defendant prior to the attack. Additionally, there was insufficient basis for the defendant to claim that his act was a reasonable defense of Mrs. Fioti. There was evidence that the defendant was afraid that because of the victim's apparent abuse, Mrs. Fioti might commit suicide. Even if true, and even if the bad character evidence had established that Mrs. Fioti was on the brink of suicide, no excuse based on justification was available to the defendant.

In Illinois, self-defense and defense of others are combined under the statute defining justifiable use of force in defense of person, which provides:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ill. Rev. Stat. 1989, ch. 38, par. 7—1 (now 720 ILCS 5/7—1 (West 1992)).

Defense of person is an affirmative defense. (Ill. Rev. Stat. 1989, ch. 38, par. 7—14 (now 720 ILCS 5/7—14 (West 1992)).) To establish defense of person, the defendant must show that unlawful force was threatened against himself or the person he is defending, that the defendant was not the aggressor, that the defendant believed the danger of harm from the victim was imminent, that the force used was necessary to avert the danger, and that the amount of force used was appropriate. (*People v. Belpedio* (1991), 212 Ill. App. 3d 155, 161.) The defendant could not satisfy any of these tests.

While it may appear from recent criminal cases in other jurisdictions which have received sensational national media

attention that a defendant may claim self-defense for acts allegedly committed by the victim well before the defendant's attack, such is clearly not the law in Illinois. The right of self-defense does not justify a person in committing an act of retaliation and revenge. *People v. Woods* (1980), 81 Ill. 2d 537, 543; *Belpedio*, 212 Ill. App. 3d at 161.

## CLOSING ARGUMENT

Finally, the defendant claims that he was denied a fair trial when the State was permitted to make comments during rebuttal closing arguments that nullified the jury instruction on the lesser-included offense of involuntary manslaughter. We note initially that a prosecutor is given wide latitude in closing argument, and improper comments will require reversal only if they result in substantial prejudice to the defendant. (*People v. Hrobowski* (1991), 216 Ill. App. 3d 711, 727.) Our review of the State's closing argument discloses nothing improper.

The defendant complains that the State's rebuttal argument had the effect of improperly urging the jury to ignore evidence that the defendant acted recklessly rather than intentionally when he shot the victim. Recklessness is the state of mind required for a finding of involuntary manslaughter. (Ill. Rev. Stat. 1989, ch. 38, par. 9—3 (now codified, as amended, at 720 ILCS 5/9—3 (West 1992)); Ill. Rev. Stat. 1991, ch. 38, par. 4—6 (now 720 ILCS 5/4—6 (West 1992)).) Among other statements complained of, the defendant cites the following passage from the State's rebuttal:

"MR. BIRKETT: It is our burden of proof. The People have the burden of proving recklessness beyond a reasonable doubt. And I submit to you that we have not proven recklessness in any fashion. It is the People's burden to prove the Defendant committed a reckless act. I submit to you we have failed in that regard; we have not proven it.

MR. REARDON: I will object. The question of lesser included is a question of law. I think Counsel is misstating it.

THE COURT: I will instruct them on the law, Mr. Birkett.

MR. BIRKETT: Ladies and gentlemen, you will get an instruction from his Honor with regard to burden of proof. I am telling you the evidence has not proven recklessness beyond a reasonable doubt, it has proven murder beyond a reasonable doubt."

Following closing arguments, the trial court gave the jury an instruction on involuntary manslaughter, which was based on Illinois Pattern Jury Instructions, Criminal, No. 7.08 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 7.08). The instruction read in relevant part:

"To sustain the charge of Involuntary Manslaughter, *the State must prove* the following propositions:

First: That the defendant performed the acts which caused the death of Anthony Fioti, Sr.; and

Second: *That the defendant performed those acts recklessly;* and

Third: That those acts were likely to cause death or great bodily harm." (Emphasis added.)

The defendant argues that once some evidence of recklessness was shown, the jury instruction should have stated that the burden then shifted to the State to disprove that mental state. The defendant also claims the instruction and argument confused the jury by seeming to advise the jury to consider only evidence of a mitigating state of mind offered by the State and to ignore any such evidence offered by the defendant.

■ While acknowledging that this precise argument was clearly and specifically rejected by our supreme court in *People v. Lucas* (1989), 132 Ill. 2d 399, the defendant nonetheless insists that, given the rebuttal argument and jury instruction given by the court, it was impossible for him to get an involuntary manslaughter finding. Because we find that the defendant has not distinguished his case from *Lucas,* and because *Lucas* is virtually identical to the present matter, we find the defendant's claim meritless.

*Lucas* held that when a jury is presented with both an involuntary manslaughter and murder instruction, the State "does not have to disprove recklessness in order to establish the intent or knowledge necessary for a murder conviction because recklessness is not an affirmative defense to murder but, rather, a separate and distinct mental state." (*Lucas,* 132 Ill. 2d at 441.) In *Lucas,* the jury was instructed on involuntary manslaughter with IPI Criminal 2d No. 7.08, the identical instruction used in the present case. The defendant in *Lucas* argued that under the dictates of *People v. Reddick* (1988), 123 Ill. 2d 184, IPI Criminal 2d No. 7.08 erroneously stated the burden of proof on the issue of recklessness, claiming that recklessness was not an element that had to be proved by the State, but rather was an affirmative defense which had to be disproved by the State once it was raised by the defendant.

However, the court in *Lucas* specifically distinguished *Reddick,* which involved an instruction for *voluntary* manslaughter, not *involuntary* manslaughter. The court in *Reddick* determined that the instruction given in that case, which required the State to prove the mental state of unreasonable justification or intense passion as one of the elements of *voluntary* manslaughter, was erroneous. The court in *Reddick* declared that once the defendant produced some evidence of unreasonable justification or intense passion, the burden shifted to the State to disprove, not prove, the mental states for voluntary man-

slaughter. The court noted that unreasonable belief and heat of passion were less culpable, or included, mental states of knowledge and/or intent.

However, the court in *Lucas* declared that recklessness, which is the mental state required for *involuntary* manslaughter, was indeed an element of the crime which had to be proved by the State and not disproved as an affirmative defense, because "recklessness is not a less culpable form of intent or knowledge. On the contrary, recklessness and knowledge are mutually inconsistent mental states." *Lucas*, 132 Ill. 2d at 442.

The court in *Reddick* declared that unless the mental states of voluntary manslaughter were treated as affirmative defenses, a defendant could never get a finding of voluntary manslaughter because the State would not put in evidence of a less culpable mental state when it was seeking a murder conviction, and the jury would likely ignore any evidence of heat or passion or unreasonable justification offered by the defense since it was instructed that the State had the burden to prove those mental states. This is not a problem, as the court in *Lucas* noted, with recklessness because that mental state is completely distinct from knowledge or intent and is not an included mental state of knowledge or intent.

Nonetheless, the defendant in the present matter claims that he was prejudiced because he was caught in the same no-win situation as described in *Reddick*. We disagree. The defendant's case is virtually identical to *Lucas*. We note also that the primary evil sought to be remedied in *Reddick*, that the State would not put in any evidence of the less culpable mental state, does not exist here. Indeed, the *only* evidence of recklessness in this case was introduced by the State, which offered the defendant's taped statement into evidence. Also, as we noted above, the defendant's inability to offer evidence of the victim's bad character did not impact the defendant's ability to prove recklessness.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

INGLIS, P.J., and GEIGER, J., concur.