Docket Nos. 100469, 100813 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROGER McCARTY, Appellant.–THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JEANYNE REYNOLDS, Appellant.

*Opinion filed October 19, 2006.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Fitzgerald and Karmeier concurred in the judgment and opinion.

Justice Freeman concurred in part and dissented in part, with opinion, joined by Justice Kilbride.

Justice Burke took no part in the decision.

# OPINION

After separate bench trials in the circuit court of Marion County, defendants Roger McCarty and Jeanyne Reynolds were convicted of knowingly manufacturing more than 900 grams of a substance containing methamphetamine. 720 ILCS 570/401(a)(6.5)(D) (West 2000).[1] Each received the mandatory minimum sentence of 15 years' imprisonment. 720 ILCS 570/401(a)(6.5)(D) (West 2000). In separate decisions, the appellate court affirmed defendants' convictions and sentences. *McCarty*, 356 Ill. App. 3d 552; *Reynolds*, 358 Ill. App. 3d 286. This court allowed defendants' petitions for leave to appeal (177 Ill. 2d R. 315) and consolidated their cases for review. For the reasons that follow, we affirm the judgments of the appellate court.

## BACKGROUND

On December 20, 2001, Deputy Mark Rose of the Marion County sheriff's department obtained a warrant to search "the trailer of Roger McCarty" for "methamphetamine[,] records of drug transactions[,] drug paraphernalia[,] [and] United States Currency."[2] Deputy Rose and a group of other police officers executed the warrant later that day. Their search divulged numerous items, including four containers of liquids suspected to contain methamphetamine, six bottles of pseudoephedrine pills, lithium batteries, hoses, a set of electronic scales, coffee filters, six one-gallon cans of camping fuel, gas masks, and a locked metal box containing $3,030 in cash and approximately 30 grams of suspected cannabis. After the search, the officers arrested defendant Roger McCarty and his fiancée, defendant Jeanyne Reynolds.

---

[1]On September 11, 2005, the Methamphetamine Control and Community Protection Act (Methamphetamine Control Act) took effect. See Pub. Act 94–556, eff. September 11, 2005. Among other things, the Methamphetamine Control Act amended section 401 of the Illinois Controlled Substances Act, which no longer applies to methamphetamine. See Pub. Act 94–556, §1065, eff. September 11, 2005 (amending 720 ILCS 570/401 (West 2004)). In this case, the preamended version of section 401 is at issue.

[2]We set forth the facts surrounding the procurement of the warrant and the search itself in greater detail during our discussion of the constitutionality of the warrant.

The next day, defendants were charged by information with unlawful manufacture of less than five grams of a substance containing methamphetamine (720 ILCS 570/401(d) (West 2000)) and unlawful possession of a methamphetamine manufacturing chemical with intent to manufacture less than 15 grams of a substance containing methamphetamine (720 ILCS 570/401(d–5), 102(z–1) (West 2000)), both of which are Class 2 felonies. Defendants were also charged with the Class 3 felony of unlawful possession with intent to deliver more than 30 grams, but not more than 500 grams, of a substance containing cannabis (720 ILCS 550/5(d) (West 2000)). A preliminary hearing was held on January 17, 2002 (725 ILCS 5/111–2 (West 2000)), and the circuit court entered findings of probable cause as to both defendants.

The State amended the informations against defendants on February 21, 2002, and again on March 4, 2002. Initially, the State omitted the counts for possession of a methamphetamine manufacturing chemical and increased the manufacturing counts from Class 2 felonies to Class X felonies, alleging that defendants manufactured more than 15 grams, but less than 100 grams, of a substance containing methamphetamine. 720 ILCS 570/401(a)(6.5)(A) (West 2000). The State then amended the manufacturing counts to allege the manufacture of more than 900 grams of a substance containing methamphetamine, thereby rendering defendants eligible for sentences of 15 to 60 years' imprisonment. 720 ILCS 570/401(a)(6.5)(D) (West 2000).

Defendants filed separate motions to suppress the evidence seized during the search. They argued that the search warrant obtained by Deputy Rose failed to describe the premises to be searched and the items to be seized with sufficient particularity. The circuit court held a consolidated suppression hearing and subsequently denied both motions in a written docket entry.

After the motions to suppress were denied, defendants filed separate motions to dismiss the methamphetamine-related counts of the informations. They argued that section 401(a)(6.5) of the Controlled Substances Act violates the proportionate penalties clause (Ill. Const. 1970, art. I, §11) and the due process clause (Ill. Const. 1970, art. I, §2) of the Illinois Constitution if the statute is interpreted to permit the weight of the byproduct produced during the

manufacture of methamphetamine to count toward determining a defendant's penalty for manufacturing the drug. The circuit court held a consolidated hearing on the motions to dismiss and denied them both.

On January 29, 2003, the State amended defendants' informations for the final time. The State added counts for possession with intent to manufacture more than 900 grams of a substance containing methamphetamine. 720 ILCS 570/401(a)(6.5)(D) (West 2000). Thus, the final counts against defendants alleged: (1) manufacture of more than 900 grams of a substance containing methamphetamine (720 ILCS 570/401(a)(6.5)(D) (West 2000)), (2) possession with intent to manufacture more than 900 grams of a substance containing methamphetamine (720 ILCS 570/401(a)(6.5)(D) (West 2000)), and (3) possession with intent to deliver more than 30 grams, but not more than 500 grams, of a substance containing cannabis (720 ILCS 550/5(d) (West 2000)).

After the State's final amendment of the informations, defendant McCarty filed a motion to dismiss counts I and II of his information. McCarty made essentially the same argument as he had with respect to his initial motion to dismiss, and the motion was denied.

On May 5, 2003, McCarty proceeded with a stipulated bench trial. The State recounted the evidence its witnesses would have offered if called to testify. According to the State, the officers who executed the search warrant would have testified that the liquid in the four containers retrieved from the search weighed approximately 1,770 grams, and the samples taken from each container later tested positive for methamphetamine. The officers would further have testified that the other materials recovered as a result of the search could be used to manufacture methamphetamine. In addition, they would have testified that the substance suspected of containing cannabis was later confirmed to contain cannabis, and its weight exceeded 30 grams.

The State also submitted into evidence a laboratory report and the written and oral statements McCarty made to the police after he was arrested. The laboratory report contained the results of the tests performed on the samples of liquid and cannabis. McCarty's statements acknowledged that the various batches of liquid contained methamphetamine, and that, on the day of the search, McCarty was in

the process of manufacturing methamphetamine so that he could sell it to make money.

McCarty stipulated to the State's evidence. He did not testify or offer any additional evidence. Based on the stipulated evidence, the trial court found McCarty guilty of all three counts against him. He did not file a posttrial motion.

On May 14, 2003, defendant Reynolds proceeded with a stipulated bench trial. The stipulated evidence was essentially the same as that presented during McCarty's trial. The State introduced the same laboratory report into evidence. In addition, according to the State, the testimony of the officers who executed the search warrant would have shown that the search divulged more than 900 grams of liquid that tested positive for the presence of methamphetamine, and more than 30 grams of a substance that tested positive for the presence of cannabis.

The State also introduced Deputy Rose's police report into evidence. The report indicated that, in Reynolds' oral statement to the police, she admitted that, on the day of the search, she had the intention to make methamphetamine and was involved in the process of doing so to make money.

Reynolds stipulated to the State's evidence. She did not testify or offer any additional evidence. She did note that she was not waiving her objections to the circuit court's rulings on her motion to suppress and her motion to dismiss. Based on the stipulated evidence, the trial court found Reynolds guilty of counts I and III. She subsequently filed a motion for a new trial arguing that her motions to suppress and dismiss were erroneously denied, and the trial court denied the motion.

Defendants' cases proceeded to sentencing. During McCarty's sentencing hearing, the trial court vacated the judgment on count II pursuant to *People v. King*, 66 Ill. 2d 551 (1977), as a conviction for a lesser-included offense. The court sentenced McCarty to concurrent prison terms of 15 years and 5 years on count I and count III respectively. Reynolds received an identical sentence. At both sentencing hearings, the State conceded that it could not prove how much usable methamphetamine defendants produced. Therefore, the State sought no fines for the street value of the methamphetamine, and none were imposed. See 730 ILCS 5/5-9-1.1 (West 2000).

Defendants filed separate appeals raising substantially similar issues (see *McCarty*, 356 Ill. App. 3d at 554-55; *Reynolds*, 358 Ill. App. 3d at 289), and the appellate court affirmed their convictions (*McCarty*, 356 Ill. App. 3d at 566; *Reynolds*, 358 Ill. App. 3d 299). The court rejected defendants' arguments that (1) the search warrant was unconstitutional, and the items seized should have been suppressed; (2) the penalty provisions in section 401(a)(6.5) of the Controlled Substances Act (720 ILCS 570/401(a)(6.5) (West 2000)) violate the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, §11); and (3) the legislature did not intend to include the byproduct produced during the manufacture of methamphetamine within the definition of "substance containing methamphetamine" (720 ILCS 570/401(a)(6.5)(D) (West 2000)). *McCarty*, 356 Ill. App. 3d at 559-65; *Reynolds*, 358 Ill. App. 3d at 294-97. The appellate court also rejected defendants' challenges to the sufficiency of the evidence supporting their cannabis-related convictions (*McCarty*, 356 Ill. App. 3d at 565-66; *Reynolds*, 358 Ill. App. 3d at 298) and Reynolds' challenge to the sufficiency of the evidence supporting her conviction for manufacturing methamphetamine (*Reynolds*, 358 Ill. App. 3d at 297-98). Defendants' challenges to the sufficiency of the evidence are not at issue in this appeal.

Defendants filed separate petitions for leave to appeal, which we allowed (177 Ill. 2d R. 315) and consolidated to address the meaning of "substance containing methamphetamine" in section 401(a)(6.5)(D) of the Controlled Substances Act (720 ILCS 570/401(a)(6.5)(D) (West 2000)). After leave to appeal was granted, McCarty requested leave to file a *pro se* supplemental brief addressing the constitutionality of the search warrant. This court allowed him to file a supplemental brief and permitted Reynolds to do the same through counsel.

ANALYSIS

This case presents four issues: (1) whether, for purposes of section 401(a)(6.5)(D) of the Controlled Substances Act (720 ILCS 570/401(a)(6.5)(D) (West 2000)), "substance containing methamphetamine" includes the byproduct produced during the manufacture of methamphetamine; if so, (2) whether section

401(a)(6.5)(D) violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, §11) or (3) the due process clause of the Illinois Constitution (Ill. Const. 1970, art. I., §2); and (4) whether the search warrant in this case violated the warrant clause of the Illinois Constitution (Ill. Const. 1970, art. I, §6) or the warrant clause of the United States Constitution (U.S. Const., amend. IV). As a preliminary matter, we address the State's argument that McCarty has forfeited the first, second, and third issues described above. For the moment, we postpone our discussion of the State's contentions regarding McCarty's and Reynolds' alleged forfeiture of the fourth issue.

The State notes that McCarty filed no posttrial motion. In addition, the State points out that McCarty did not raise his challenges to the constitutionality of section 401(a)(6.5)(D) in his petition for leave to appeal. In general, the failure to raise an issue in a posttrial motion results in the forfeiture of that issue on appeal. *People v. Cuadrado*, 214 Ill. 2d 79, 89 (2005); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Likewise, the failure to raise an issue in a petition for leave to appeal results in the forfeiture of that issue before this court. *People v. Carter*, 208 Ill. 2d 309, 318 (2003); *People v. Anderson*, 112 Ill. 2d 39, 43-44 (1986). However, as this court has noted in the past, a challenge to the constitutionality of a statute may be raised at any time. *In re J.W.*, 204 Ill. 2d 50, 61-62 (2003); *People v. Wright*, 194 Ill. 2d 1, 23-24 (2000) (allowing defendant to challenge constitutionality of statute for first time in petition for rehearing); *People v. Bryant*, 128 Ill. 2d 448, 454 (1989). Therefore, McCarty has not forfeited his proportionate penalties and due process challenges to the constitutionality of section 401(a)(6.5)(D). Furthermore, because McCarty's argument regarding the interpretation of the statute is directly related to his constitutional challenges, that argument likewise has not been forfeited.

I. Interpretation of Section 401(a)(6.5)(D)

We first address the issue of statutory interpretation raised by defendants. Section 401 of the Illinois Controlled Substances Act (720 ILCS 570/401 (West 2000)) provides in relevant part that:

> "[I]t is unlawful for any person knowingly to: (i) *manufacture* or deliver, or possess with intent to manufacture

or deliver, a controlled or counterfeit substance or controlled substance analog ***. ***

(a) Any person who violates this Section with respect to the following amounts of controlled or counterfeit substances or controlled substance analogs *** is guilty of a Class X felony and shall be sentenced to a term of imprisonment as provided in this subsection (a) *** :

* * *

(6.5) ***

* * *

(D) not less than 15 years and not more than 60 years with respect to *900 grams or more of any substance containing methamphetamine* or any salt of an optical isomer of methamphetamine, or an analog thereof." (Emphases added.) 720 ILCS 570/401 (West 2000).

Defendants were convicted of manufacturing over 900 grams of a "substance containing methamphetamine" in violation of section 401(a)(6.5)(D) of the Act. The record on appeal does not disclose the exact chemical composition of the liquid seized from defendants. However, defendants and the State refer to it throughout their briefs as the byproduct of the methamphetamine manufacturing process, and we shall do so as well.

Defendants argue that the legislature intended "substance containing methamphetamine" to refer only to usable, finished methamphetamine and did not intend the unusable byproduct produced during the methamphetamine manufacturing process to count toward the drug weight used in determining the appropriate sentencing range for the offense of manufacturing methamphetamine. The State, on the other hand, argues that the legislature intended "substance containing methamphetamine" to include the byproduct produced during the methamphetamine manufacturing process, asserting that the plain language of section 401(a)(6.5)(D) requires this conclusion. The issue before us is thus whether, for purposes of section 401(a)(6.5)(D), "substance containing methamphetamine" includes the byproduct produced during the manufacture of methamphetamine.

The interpretation of a statute presents a question of law, which we review *de novo*. *People v. Roberts*, 214 Ill. 2d 106, 116 (2005).

The fundamental rule of statutory interpretation is to give effect to the intent of the legislature. *People v. Jones*, 214 Ill. 2d 187, 193 (2005). Accordingly, a court must consider a statute in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it. *People v. Wooddell*, 219 Ill. 2d 166, 170 (2006). The best indication of the legislature's intent is the language of the statute, given its plain and ordinary meaning. *People v. Hari*, 218 Ill. 2d 275, 292 (2006). Where the language is clear and unambiguous, it will be given effect without resorting to further aids of construction. *People v. Collins*, 214 Ill. 2d 206, 214 (2005).

Section 401 does not define "substance containing methamphetamine." See 720 ILCS 570/401 (West 2000). However, the plain meaning of the phrase compels us to conclude that the legislature did not intend to exclude the weight of the byproduct produced during the manufacture of methamphetamine from the total weight used in determining an individual's sentence for manufacturing methamphetamine. Given its plain and ordinary meaning, "substance" is defined as "material from which something is made and to which it owes its characteristic qualities." Webster's Third New International Dictionary 2279 (2002). The byproduct of the methamphetamine manufacturing process clearly qualifies as material from which methamphetamine is made and to which methamphetamine owes its characteristic qualities. Accordingly, byproduct that contains traces of methamphetamine qualifies as a "substance containing methamphetamine." Thus, here, the liquid that tested positive for the presence of methamphetamine was a "substance containing methamphetamine," despite the State's inability to prove that any of the methamphetamine was usable.

If the legislature had intended to limit the application of section 401(a)(6.5)(D) to methamphetamine that is usable or consumable or marketable, it could easily have done so. In the absence of the legislature's express statement of such a limitation, we decline to read one into the statute. See, *e.g.*, *In re Christopher K.*, 217 Ill. 2d 348, 364 (2005). See also *People v. McCleary*, 353 Ill. App. 3d 916, 925 (2004) (noting that section 401(a)(6.5)(D) "unequivocally contemplates the inclusion of more than usable methamphetamine in the weight calculation"); *People v. Haycraft*, 349 Ill. App. 3d 416, 428 (2004) ("Methamphetamine is its ingredients, *i.e.*, anhydrous ammonia, pseudoephedrine, and lithium, combined in a mixture,

whether cooked to its final, marketable form or not. The defendant combined the methamphetamine ingredients into the container; thus, the mixture in the container constituted a 'substance containing methamphetamine' ").

Notably, defendants do not dispute that the plain meaning of "substance containing methamphetamine" encompasses byproduct of the methamphetamine manufacturing process that tests positive for the presence of the drug. Instead, they contend that interpreting "substance containing methamphetamine" in this manner produces absurd results. Defendants reason that it is absurd to punish as a Class X felon "the first-time or occasional, small-batch manufacturer" who does not even create usable methamphetamine. They also claim it is absurd for such an individual to receive punishment identical to that of a successful manufacturer who produces an equivalent amount of usable methamphetamine. We find these arguments unpersuasive.

In interpreting a statute, we presume the legislature did not intend absurd results. *People v. Botruff*, 212 Ill. 2d 166, 175 (2004). Manufacturing methamphetamine is a dangerous process involving toxic and combustible chemicals. See, *e.g.*, *People v. Gallaher*, 348 Ill. App. 3d 1023, 1025-26 (2004) (describing dangers of manufacturing methamphetamine); *United States v. Chamness*, 435 F.3d 724, 727-28 (7th Cir. 2006) (same); see also Pub. Act 94–556, eff. September 11, 2005 (adding 720 ILCS 646/5) (finding that "the manufacture of methamphetamine is extremely and uniquely harmful"). Given that the process is so hazardous, there is no absurdity in strictly punishing an individual who engages in it, even if he or she does so only once and is unable to produce any usable methamphetamine. As we have noted, the legislature has broad discretion in setting criminal penalties. *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005).

Relatedly, there is no absurdity in treating a quantity of finished, usable methamphetamine the same for sentencing purposes as an identical quantity of manufacturing byproduct that contains traces of unusable methamphetamine. While finished, usable methamphetamine carries with it the added danger to society of being distributed, a quantity of the latter and an identical quantity of unusable byproduct are both results of the same highly dangerous manufacturing process. As the appellate court noted in McCarty's

appeal: "A methamphetamine manufacturer poses a threat to the public health and safety not only because he is attempting to produce a highly dangerous and addictive product *but also* because he is engaged in a process involving highly toxic and combustible chemicals. Increasingly, 'labs' are located in populated areas." (Emphasis added.) *McCarty*, 356 Ill. App. 3d at 563-64.

Defendants also argue that other, related statutory provisions provide evidence that the legislature intended "substance containing methamphetamine" to refer only to usable methamphetamine. As we have already noted, the plain meaning of section 401(a)(6.5)(D) is clear, and we see no absurdity in applying the language of the statute as written. We wish to emphasize, however, that defendants' reliance on other statutory provisions is unconvincing on its own terms.

Defendants initially rely on the statement of legislative intent in the Controlled Substances Act (720 ILCS 570/100(5) (West 2000)) and on section 2D1.1 of the Federal Sentencing Guidelines (U.S. Sentencing Guidelines Manual §2D1.1, Commentary Note 1, at 120 (2001)). They argue that because the federal government's approach to sentencing individuals convicted of manufacturing methamphetamine takes into consideration only the weight of usable methamphetamine, and because our state legislature has expressed its intent to unify Illinois' controlled substance regulatory system with that of the federal government, it is reasonable to conclude that the legislature intended to utilize the same "market-oriented" sentencing scheme for methamphetamine manufacturing as the federal government. The State, in response, disputes defendants' characterization of the federal approach to methamphetamine sentencing, arguing it is not as straightforward as defendants suggest. According to the State, it is "far from clear" that the market-oriented approach adopted by the Federal Sentencing Guidelines also applies to determining an individual's statutorily designated mandatory minimum sentence. Thus, the State claims, there is disagreement among the federal circuit courts of appeals as to when the market-oriented approach is applicable.

The Controlled Substances Act does indeed state that one of its purposes is to "unify where feasible and codify the efforts of this State to conform with the regulatory systems of the Federal government and other states to establish national coordination of

efforts to control the abuse of controlled substances." 720 ILCS 570/100(5) (West 2000). It is well established, however, that a declaration of policy or a preamble is not a part of the act itself (*Brown v. Kirk*, 64 Ill. 2d 144, 152 (1976)) and has no substantive legal force (*Lieber v. Board of Trustees of Southern Illinois University*, 176 Ill. 2d 401, 414 (1997)). While it may be used as a tool of statutory construction (*Atkins v. Deere & Co.*, 177 Ill. 2d 222, 228 (1997)), it may not be used to create an ambiguity in an otherwise unambiguous statute (*Triple A Services, Inc. v. Rice*, 131 Ill. 2d 217, 227 (1989)). As this court has stated, "[t]o the extent that any *express* language in a statute contradicts a preamble, the statutory language controls." (Emphasis in original.) *Atkins*, 177 Ill. 2d at 234. Here, we will not override the unambiguous language of section 401(a)(6.5)(D) to give effect to an aspirational policy objective set forth in the Controlled Substances Act's statement of legislative intent.

Furthermore, even if we were to accord an unprecedented degree of weight to the Act's statement of legislative intent in interpreting section 401(a)(6.5)(D), we could not unequivocally conclude that the market-oriented approach to methamphetamine sentencing represents "the regulatory system[ ] of the Federal government" (720 ILCS 570/100(5) (West 2000)). After carefully considering the federal cases cited to us by the parties (*United States v. Hardin*, 437 F.3d 463 (5th Cir. 2006); *United States v. Combs*, 379 F.3d 564 (9th Cir. 2004); *United States v. Stewart*, 361 F.3d 373 (7th Cir. 2004); *United States v. Kuenstler*, 325 F.3d 1015 (8th Cir. 2003); *United States v. Zackery*, 165 F.3d 22 (4th Cir. 1998) (unpublished opinion); *United States v. Sprague*, 135 F.3d 1301 (9th Cir. 1998); *United States v. Richards*, 87 F.3d 1152 (10th Cir. 1996); *United States v. LeVay*, 76 F.3d 671 (5th Cir. 1996); *United States v. Campbell*, 61 F.3d 976 (1st Cir. 1995); *United States v. Palacios-Molina*, 7 F.3d 49 (5th Cir. 1993); *United States v. Johnson*, 999 F.2d 1192 (7th Cir. 1993); *United States v. Newsome*, 998 F.2d 1571 (11th Cir. 1993); *United States v. Salgado-Molina*, 967 F.2d 27 (2d Cir. 1992); *United States v. Jennings*, 945 F.2d 129 (6th Cir. 1991)), we observe that, while the Federal Sentencing Guidelines mandate the use of the market-oriented approach (U.S. Sentencing Guidelines Manual §2D1.1, Commentary Note 1, at 120 (2001)), the same is not necessarily true of section 841(b) of the United States Code (21 U.S.C. §841(b)

(2000)), which establishes mandatory minimum sentences for manufacturing methamphetamine. Defendants have only identified two federal circuits–the sixth and seventh–that apply the market-oriented approach to methamphetamine sentencing under both the guidelines and section 841(b). See *Jennings*, 945 F.2d at 136; *Stewart*, 361 F.3d at 378; see also *Johnson*, 999 F.2d at 1196. The State, by contrast, has identified four circuits–the fifth, eighth, ninth, and tenth–that have opted not to apply the market-oriented approach under section 841(b). See *Palacios-Molina*, 7 F.3d at 53, citing *United States v. Sherrod*, 964 F.2d 1501, 1510 (1992); *Kuenstler*, 325 F.3d at 1023; *Sprague*, 135 F.3d at 1306 n.4; *Richards*, 87 F.3d at 1157-58. Of the remaining cases cited by the parties, six merely confirm, unremarkably, the federal courts' application of the market-oriented approach under the guidelines. See *Hardin*, 437 F.3d at 469-71; *Zackery*, 165 F.3d 22 (unpublished opinion); *LeVay*, 76 F.3d at 673-74; *Campbell*, 61 F.3d at 982-83; *Newsome*, 998 F.2d at 1575-79; *Salgado-Molina*, 967 F.2d at 28-29. As for *Combs*, a recently decided ninth circuit case, it does focus on section 841(b), but in the context of a different issue: whether the transfer of methamphetamine waste material for the sole purpose of disposal can support a conviction for methamphetamine distribution under the statute. See *Combs*, 379 F.3d at 569-71. Given the nuances of the federal case law, it would be overly simplistic to characterize the federal government's "regulatory system[ ]" (720 ILCS 570/100(5) (West 2000)) for methamphetamine sentencing as the market-oriented approach defendants urge us to adopt.

Defendants also argue that, taken together, various sections of the Controlled Substances Act implicitly suggest the legislature intended "substance containing methamphetamine" to mean a substance that is consumable. They contend that the Act's definition of a "controlled substance analog" as "intended for human consumption" (720 ILCS 570/401 (West 2000)) indicates that the legislature intended "substance containing methamphetamine" to be interpreted the same way. Additionally, defendants cite language from the Act's statement of legislative intent providing that one purpose of the Act is to "acknowledge the functional and consequential differences between the various types of controlled substances and provide for correspondingly different degrees of control over each of the various types" (720 ILCS 570/100(4) (West 2000)). According to defendants,

˘13˘

the "functional and consequential differences" between pure methamphetamine and byproduct of the manufacturing process are too great for the legislature to have intended to treat the substances identically. Furthermore, defendants argue that because Schedule II of the Act describes methamphetamine as "having a stimulant effect on the central nervous system" (720 ILCS 570/206(d) (West 2000)), the legislature must have been targeting usable methamphetamine.

Section 401 of the Act provides, in part, that "[f]or purposes of this Section, 'controlled substance analog' or 'analog' means a substance which is intended for human consumption, other than a controlled substance, that has a chemical structure substantially similar to that of a controlled substance *** or that was specifically designed to produce an effect substantially similar to that of a controlled substance ***." 720 ILCS 570/401 (West 2000). Contrary to defendants' suggestion, this definition has no bearing on the meaning of the phrase "substance containing methamphetamine" in section 401(a)(6.5)(D). Section 401(a)(6.5)(D) establishes the penalty for manufacturing "900 grams or more of any substance containing methamphetamine *** or an analog thereof." 720 ILCS 570/401(a)(6.5)(D) (West 2000). Reading this provision in conjunction with the definition of "controlled substance analog," it is evident that a "substance containing" another substance that is "intended for human consumption" need not itself be consumable.

As for defendants' reference to the Act's statement of legislative intent, we reiterate that a declaration of policy or a preamble is not a part of the act itself (*Brown*, 64 Ill. 2d at 152) and has no substantive legal force (*Lieber*, 176 Ill. 2d at 414). In enacting section 401(a)(6.5)(D), the legislature did not deem the difference between usable methamphetamine and manufacturing byproduct containing traces of the drug to be sufficiently "functional and consequential" (720 ILCS 570/100(4) (West 2000)) to warrant "different degrees of control" (720 ILCS 570/100(4) (West 2000)). Accordingly, it would be inappropriate for us to do so here.

Turning to Schedule II, we observe that it enumerates various substances that fall within the ambit of the Controlled Substances Act (see 720 ILCS 570/201, 206 (West 2000)), including "any material, compound, mixture, or preparation which contains any quantity of the following substances having a stimulant effect on the central nervous

system: *** [m]ethamphetamine" (720 ILCS 570/206(d) (West 2000)). Defendants incorrectly read the phrase "having a stimulant effect on the central nervous system" as requiring any "mixture" containing methamphetamine to have such an effect in order to qualify as a controlled substance regulated by the Act. Under the principle of statutory interpretation known as the last antecedent doctrine, a referential and qualifying phrase refers solely to the last antecedent. *Bowman v. American River Transportation Co.*, 217 Ill. 2d 75, 83 (2005); *People v. Davis*, 199 Ill. 2d 130, 138 (2002); *Advincula v. United Blood Services*, 176 Ill. 2d 1, 26 (1996). In section 206(d), the last antecedent of the qualifying end phrase "having a stimulant effect on the central nervous system" is "following substances," which refers to "amphetamine," "methamphetamine," "phenmetrazine," and "methylphenidate." See 720 ILCS 570/206(d) (West 2000). Thus, the phrase "having a stimulant effect on the central nervous system" merely describes methamphetamine and the other substances listed in conjunction with it. It does not limit the coverage of the Act to mixtures containing methamphetamine that are, as a whole, consumable, and thereby capable of having an actual stimulant effect on the central nervous system.

Finally, defendants urge this court to interpret section 401(a)(6.5)(D) of the Act *in pari materia* with section 401(a)(6.6) (720 ILCS 570/401(a)(6.6) (West 2000)). Section 401(a)(6.6) of the Act criminalizes the possession of methamphetamine manufacturing chemicals with the intent to manufacture methamphetamine. 720 ILCS 570/401(a)(6.6) (West 2000). Defendants claim that, for purposes of that offense, "substance containing methamphetamine" refers only to usable methamphetamine. They reason that, if the phrase were interpreted to refer to byproduct, then the "first few" sentencing categories of section 401(a)(6.6), particularly that of subparagraph (A), would be rendered null and void. This would be so, they argue, because everyone who intends to manufacture methamphetamine intends, *ipso facto*, to produce many hundreds of grams of chemical byproduct, thus placing them outside the sentencing categories in section 401(a)(6.6) that are applicable to small amounts of a "substance containing methamphetamine." It follows, defendants conclude, that "substance containing methamphetamine" in section 401(a)(6.5)(D) should also be

˘15˘

interpreted to refer only to usable methamphetamine. In response, the State argues that section 401(a)(6.6) employs the "substance containing methamphetamine" language in the context of a different offense than section 401(a)(6.5)(D), and that, accordingly, section 401(a)(6.6) has no bearing on the meaning of "substance containing methamphetamine" in section 401(a)(6.5)(D).

Under the doctrine of *in pari materia*, two statutes dealing with the same subject will be considered with reference to one another to give them harmonious effect. *People v. Taylor*, 221 Ill. 2d 157, 161 n.1 (2006). The doctrine is also applicable to different sections of the same statute, and is consistent with the fundamental rule of statutory interpretation that all the provisions of a statute must be viewed as a whole. *Land v. Board of Education of the City of Chicago*, 202 Ill. 2d 414, 422 (2002). For present purposes, we need not undergo an exhaustive analysis of how to determine sentencing weights under section 401(a)(6.6). Assuming, *arguendo*, that, as defendants suggest, section 401(a)(6.6) refers only to the amount of usable methamphetamine that an individual could produce using the precursor chemicals in his or her possession, it does not follow that section 401(a)(6.5)(D) must also refer to usable methamphetamine for the provisions to be interpreted harmoniously. Manufacturing a substance containing methamphetamine and possessing a methamphetamine manufacturing chemical with the intent to manufacture a substance containing methamphetamine are different offenses that target different conduct. To sustain a conviction for the latter offense, the State does not have to demonstrate that an individual actually produced a "substance containing methamphetamine." It is sufficient to show that the individual intended to do so. See, *e.g.*, *People v. Dorsey*, 362 Ill. App. 3d 263, 268 (2005) ("Intent to manufacture is clearly a substitute for actual manufacture"). Thus, under section 401(a)(6.6), the applicable sentence depends on an estimation of the amount of "substance containing methamphetamine" that an individual intended to, but did not actually, manufacture. In contrast, under section 401(a)(6.5)(D), the applicable sentence depends on the weight of an actual substance containing successfully manufactured methamphetamine. Defendants' reading of section 401(a)(6.6) and section 401(a)(6.5)(D) is premised on the mistaken assumption that the sentencing weights for two discrete offenses must be calculated by identical means.

II. Constitutionality of Section 401(a)(6.5)(D)

Having concluded that, for purposes of section 401(a)(6.5)(D), "substance containing methamphetamine" includes the byproduct produced during the manufacture of methamphetamine, we examine the constitutionality of section 401(a)(6.5)(D). Defendants argue that section 401(a)(6.5)(D), as interpreted above, violates both the proportionate penalties clause (Ill. Const. 1970, art. I, §11) and the due process clause (Ill. Const. 1970, art. I, §2) of the Illinois Constitution. Whether a statute is constitutional is a question of law, which we review *de novo*. *People v. Guevara*, 216 Ill. 2d 533, 541 (2005). In general, statutes carry a strong presumption of constitutionality, and a party challenging a statute has the burden of rebutting that presumption. *People v. Cornelius*, 213 Ill. 2d 178, 189 (2004). In addition, a court has a duty to uphold the constitutionality of a statute if it is reasonably possible to do so. *People v. Dinelli*, 217 Ill. 2d 387, 397 (2005).

At the outset, we observe that defendants' proportionate penalties and due process challenges overlap considerably with one another, as well as with their contention that interpreting "substance containing methamphetamine" to include the byproduct of the methamphetamine manufacturing process produces absurd results. Defendants argue that section 401(a)(6.5)(D) violates the proportionate penalties clause because it is "cruelly harsh" to penalize an individual who manufactures a substance that contains no usable methamphetamine with the same term of imprisonment as an individual who manufactures an identical quantity of pure methamphetamine. Similarly, defendants argue that section 401(a)(6.5)(D) violates the due process clause because, given that they produced no usable methamphetamine, their 15-year minimum sentences are not reasonably designed to remedy the harm the legislature sought to address in establishing that penalty. Defendants assert that it is unfair to punish a methamphetamine manufacturer who has not produced usable methamphetamine as severely as one who has by basing the penalty for manufacturing methamphetamine on the gross weight of any substance produced that contains the drug.

In response, the State argues that defendants' proportionate penalties challenge relies on cross-comparison analysis, which this

court rejected in *People v. Sharpe*, 216 Ill. 2d 481 (2005). Alternatively, the State argues that, to the extent defendants claim their sentences are cruel and degrading, they fail to acknowledge the dangers unique to manufacturing methamphetamine that justify their 15-year terms of imprisonment. Similarly, with respect to defendants' due process challenge, the State argues that by imposing a sentence based on the weight of the entire mixture in which methamphetamine is being manufactured, the legislature targeted both the threat to public safety that arises from making an addictive, harmful drug and the threat that arises from doing so using a highly dangerous method.

A. Proportionate Penalties Challenge

We first address defendants' proportionate penalties challenge. The proportionate penalties clause of the Illinois Constitution requires the legislature to determine a penalty according to the seriousness of the offense, and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, §11. Prior to our decision in *Sharpe*, 216 Ill. 2d 481, a defendant could challenge a penalty pursuant to the proportionate penalties clause by (1) comparing it to the penalty for a similar offense with different elements, (2) comparing it to the penalty for an offense with identical elements, or (3) arguing that the penalty was cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community. See, *e.g.*, *People v. Moss*, 206 Ill. 2d 503, 522 (2003). In *Sharpe*, we abandoned cross-comparison analysis as part of our proportionate penalties jurisprudence. *Sharpe*, 216 Ill. 2d at 519-21. Thus, a defendant may no longer premise a proportionate penalties challenge on the comparison of similar offenses with different elements. *Sharpe*, 216 Ill. 2d at 521. A defendant may, however, still argue that a penalty for a particular offense violates the "cruel or degrading" standard or is harsher than the penalty for an offense with identical elements. *Sharpe*, 216 Ill. 2d at 521.

As mentioned, the State suggests that defendants' proportionate penalties challenge is based on a comparison of two offenses with different elements: manufacturing methamphetamine and distributing methamphetamine. Defendants did partially rely on a cross-comparison analysis of these two offenses before the appellate court

˘18˘

(*McCarty*, 356 Ill. App. 3d at 563; *Reynolds*, 358 Ill. App. 3d at 296), but their appeals were decided prior to *Sharpe*. While they could have stated the precise basis for their present proportionate penalties challenge more clearly, we do not understand them to renew their cross-comparison argument, but rather to assert that the 15-year mandatory minimum sentence set forth in section 401(a)(6.5)(D) violates the "cruel or degrading" standard–*i.e.*, that it is "cruelly harsh" to penalize an individual who manufactures a substance that contains only traces of unusable methamphetamine as severely as one who manufactures an identical quantity of usable methamphetamine.

We find defendants' argument unavailing. In general, "the legislature has the authority to set the nature and extent of criminal penalties," and "courts may not interfere with such legislation unless the challenged penalty is clearly in excess of the very broad and general constitutional limitations applicable." *People v. Morgan*, 203 Ill. 2d 470, 488 (2003), *overruled on other grounds by Sharpe*, 216 Ill. 2d at 519. As we noted in rejecting defendants' assertion that our interpretation of section 401(a)(6.5)(D) produces absurd results, manufacturing methamphetamine is a dangerous process involving toxic and combustible chemicals, and regardless of whether an individual successfully completes the methamphetamine manufacturing process, merely engaging in it poses a serious threat to public safety. Accordingly, we cannot say that the sentencing category established by section 401(a)(6.5)(D) is cruel or degrading or a shock to the moral sense of the community just because the legislature has chosen not to condition an individual's eligibility for it on the level of refinement the individual achieves during the methamphetamine manufacturing process. We therefore conclude that section 401(a)(6.5)(D) does not violate the proportionate penalties clause.

### B. Due Process Challenge

Turning to defendants' due process challenge, we note that to satisfy the requirements of the due process clause, a penalty must be reasonably designed to remedy the particular evil that the legislature was targeting. *Sharpe*, 216 Ill. 2d at 531, citing *People v. Steppan*, 105 Ill. 2d 310, 319 (1985). In arguing that section 401(a)(6.5)(D)'s

failure to account for the difference between pure methamphetamine and manufacturing byproduct violates this standard, defendants rely heavily on the Controlled Substance Act's statement of legislative intent, which provides in part that: "It is not the intent of the General Assembly to treat the unlawful user or occasional petty distributor of controlled substances with the same severity as the large-scale, unlawful purveyors and traffickers of controlled substances." 720 ILCS 570/100 (West 2000). Defendants interpret this provision to indicate that the legislature did not intend to treat "minor players" in the drug trade as harshly as "kingpins," and they style themselves the former. In addition, defendants suggest that because the legislature has enacted other statutes that prohibit the dangerous conduct associated with manufacturing methamphetamine (see 720 ILCS 570/401(a)(6.6) (West 2000) (prohibiting possession of methamphetamine manufacturing chemicals with intent to manufacture methamphetamine); 415 ILCS 5/12(a) (West 2000) (prohibiting water pollution); 415 ILCS 5/21(a) (West 2000) (prohibiting land pollution); 720 ILCS 5/20–1.4 (West 2004) (criminalizing controlled substance manufacturing arson); 720 ILCS 5/20–1.5 (West 2004) (criminalizing aggravated controlled substance manufacturing arson)), it follows that section 401(a)(6.5)(D)'s coverage of that conduct is irrational.

With respect to defendants' reference to the Act's statement of legislative intent, we initially observe that the provision they cite focuses on punishment for users and distributors of controlled substances. See 720 ILCS 570/100 (West 2000) (contrasting "unlawful user[s]" and "occasional petty distributor[s]" with "large-scale, unlawful purveyors and traffickers"). Defendants were not simply "user[s]" or "occasional petty distributor[s]" of methamphetamine. They were manufacturers of the drug, albeit unsuccessful ones. Therefore, the provision on which they rely is inapposite.

More importantly, the Act's statement of legislative intent indicates that the legislature had multiple purposes in mind in promulgating the Act. For instance, the legislature indicated its intent to "(1) limit access of [controlled] substances only to those persons who have demonstrated an appropriate sense of responsibility and have a lawful and legitimate reason to possess them [and] (2) deter the unlawful and destructive abuse of controlled substances." 720

ILCS 570/100 (West 2000). The legislature could reasonably have concluded that punishing manufacturers of methamphetamine with a strict penalty, regardless of the ultimate success of their enterprise, discourages even casual experimentation with producing the drug, thereby reducing the quantity of the drug available to individuals with no "legitimate reason to possess" it (720 ILCS 570/100(1) (West 2000)), and preventing its "unlawful and destructive abuse" (720 ILCS 570/100(2) (West 2000)). Furthermore, given the unique dangers associated with the manufacture of methamphetamine, the legislature could reasonably have determined that punishing the manufacturing process is equally as important as punishing its result.

As for defendants' argument that, insofar as section 401(a)(6.5)(D) targets the dangers of the methamphetamine manufacturing process, it is duplicative, and thus irrational, we simply note that we see no irrationality in an attempt by the legislature to target a threat to the welfare of the public from as many angles as it deems necessary. As we have noted in the past, "the legislature has broad discretion to determine not only what the public interest and welfare require, but to determine the measures needed to secure such interest." *Chicago National League Ball Club, Inc. v. Thompson*, 108 Ill. 2d 357, 364 (1985).

Unquestionably, then, section 401(a)(6.5)(D) is reasonably designed to remedy the particular evils the legislature was targeting in enacting it. *Sharpe*, 216 Ill. 2d at 531, citing *Steppan*, 105 Ill. 2d at 319. We find no due process violation in the legislature's determination that manufacturing greater than 900 grams of a substance containing methamphetamine, regardless of whether the methamphetamine is usable, merits a penalty of 15 to 60 years' imprisonment.

### III. Constitutionality of Search Warrant

Finally, we turn to the issue of whether the warrant in this case was unconstitutional. The fourth amendment of the United States Constitution provides, in relevant part, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. Likewise, section 6 of

article I of the Illinois Constitution states "No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, §6. See also 725 ILCS 5/108–7 (West 2000) (requiring the place or person to be searched and the items to be seized to be "particularly described in the warrant").

Defendants challenge the constitutionality of the warrant on three bases. First, they argue that the warrant failed to describe the place to be searched with sufficient particularity. Second, they argue that the warrant failed to describe the items to be seized with sufficient particularity. Third, they argue that the warrant was overly broad because insufficient probable cause supported the warrant's authorization to search certain places and individuals. Before examining these arguments, we address the State's contention that defendants have forfeited their challenges to the constitutionality of the warrant.

The State correctly points out that McCarty did not challenge the constitutionality of the warrant in a posttrial motion (see *Cuadrado*, 214 Ill. 2d at 89 (failure to raise issue in posttrial motion results in forfeiture of issue on appeal)) or in his petition for leave to appeal (see *Carter*, 208 Ill. 2d at 318 (failure to raise issue in petition for leave to appeal results in forfeiture of issue before this court)). The State also correctly points out that Reynolds did not challenge the constitutionality of the warrant in her petition for leave to appeal. See *Carter*, 208 Ill. 2d at 318. We add that McCarty did not object to the admission of the evidence obtained pursuant to the warrant at trial. See *Enoch*, 122 Ill. 2d at 186 (objection at trial necessary to preserve error for appellate review). We also add that neither McCarty nor Reynolds raised their arguments regarding the lack of particularity in the warrant's description of the items to be seized or the overbreadth of the warrant in their motions to suppress or at their consolidated suppression hearing. Thus, the circuit court did not consider these arguments. See *People v. Holloway*, 86 Ill. 2d 78, 91 (1981) (issues not raised in circuit court generally considered forfeited on appeal). For these reasons, both McCarty and Reynolds have forfeited their arguments regarding the warrant's lack of particularity and their argument regarding the overbreadth of the warrant.

We observe, however, that the appellate court reviewed McCarty's and Reynolds' challenges to the constitutionality of the warrant on the merits. *McCarty*, 356 Ill. App. 3d at 559-62; *Reynolds*, 358 Ill. App. 3d at 294-96. Furthermore, we granted McCarty and Reynolds leave to file supplemental briefs addressing the constitutionality of the warrant. In light of these considerations, and because the rule of forfeiture is "an admonition to the parties and not a limitation on the jurisdiction of this court" (*People v. Normand*, 215 Ill. 2d 539, 544 (2005); *Hux v. Raben*, 38 Ill. 2d 223, 224-25 (1967)), we choose to review defendants' arguments regarding the lack of particularity and the overbreadth of the warrant on the merits. Accordingly, we set forth the relevant facts.

The evidence presented at defendants' consolidated suppression hearing reveals that, on December 20, 2001, Deputy Mark Rose of the Marion County sheriff's department received a phone call from a confidential informant who claimed to have information about a local methamphetamine lab. Deputy Rose and the informant appeared before a judge, and the informant signed a complaint for a search warrant under oath.

In the complaint, the informant described the places to be searched as "Roger McCarty's trailer located approximately 3/4 of a mile south of the intersection of Kinlou Rd[.] [and] O'Leary Rd.[,] being the 3rd traler [*sic*] east of O'Leary Rd[.][,] and a camper located in the woods east of the trailer." The informant described the items to be seized as "the following instruments, articles, and things which have been used in the commission of, or which constitute evidence of, the offense of [unlawful possession] of methamphetamine[:] any and all quantities of methamphetamine[,] records of drug transactions[,] drug paraphernalia[,] [and] United States currency." The informant further stated that he had probable cause to believe the items to be seized were presently located on the described premises. He alleged that, earlier that day, he had been to McCarty's trailer and had seen McCarty smoking methamphetamine. In addition, he alleged that "McCarty had more methamphetamine and admitted to manufacturing methamphetamine at this location."

Based on the information provided in the complaint, the judge issued a warrant authorizing the search of "the trailer of Roger McCarty located approximately 3/4 of a mile south of the intersection

of Kinlou Rd[.] [and] O'Leary Rd[.][,] being the 3rd trailer east of O'Leary Rd[.][,] and a camper located in the woods east of the trailer, including outbuildings, motor vehicles[,] [and] occupants." The warrant further authorized the seizure of "the following instrument [*sic*], articles[,] and things which have been used in the commission of, or which constitute evidence of, the offense of [unlawful possession] of methamphetamine ***: any and all quantities of methamphetamine[,] records of drug transactions[,] drug paraphernalia[,] [and] United States currency."

Later that day, Deputy Rose and a group of other police officers drove to the property where the trailer described in the warrant was located to execute the warrant. The property is in a rural area approximately five miles east of Kinmundy, Illinois. O'Leary Road runs north and south along the property's western edge, and a private drive extends eastward onto the property from O'Leary Road before gradually curving north. At the time of the search, the property contained a total of four trailers located at various intervals along the private drive. They were, from the beginning of the private drive onward: 7912 O'Leary Road, a trailer with no address, 7910 O'Leary Road, and 7914 O'Leary Road.

The officers arrived at the property around 1:45 p.m. and proceeded to the trailer at 7914 O'Leary Road. They detained two individuals in the vicinity of the trailer, Allen Keen and Rita Smith, and Deputy Rose knocked on the trailer door, announcing he had a search warrant. Deputy Rose waited approximately five seconds, and when no one responded, he entered the trailer. The occupants included McCarty, Reynolds, and McCarty's teenage son. McCarty's son was taken to his grandfather's residence, the trailer with the address of 7910 O'Leary Road. Reynolds was escorted from the trailer and detained outside. Deputy Rose spoke with McCarty, who identified himself and gave his address as 7912 O'Leary Road.

Subsequently, the officers conducted a search of the trailer, the nearby camper, and the surrounding area. As mentioned, the search divulged four containers of liquid later confirmed to contain methamphetamine, various items commonly used to manufacture methamphetamine, cash, and cannabis. As a result of the search, McCarty and Reynolds were placed under arrest.

After the search, Deputy Rose prepared a narrative report in which he noted the address of the trailer searched as 7912 O'Leary Road. Deputy Rose was questioned extensively on this point at the suppression hearing. He testified that he did not know the address of the trailer prior to the search, and that he relied on the informant's description of the location of the trailer to serve the warrant. According to Deputy Rose, he was familiar with the layout of the property on which the trailer was located and knew which trailer the informant described because he had served papers on the property in the past. He did not learn that the address of the trailer that was searched was 7914 O'Leary Road until defendants' preliminary hearing. Deputy Rose explained that 7912 O'Leary Road was the address McCarty gave him when he interviewed McCarty on the scene, and that, at the time the warrant was served, he believed McCarty owned and lived in the trailer that was searched. Deputy Rose also testified that he was unaware of the presence of the trailer with no address until returning to the property after the search. He described that trailer as still being on wheels and containing no decorative "underpinning" to hide them. According to Deputy Rose, the trailer was "somewhat hidden" from the road. When asked why he did not go to the property prior to executing the warrant to check how many trailers were on the property, Deputy Rose responded that O'Leary Road is clearly visible from the trailers at 7912 and 7914 O'Leary Road, and he did not want to raise the suspicion of anyone on the property.

Deputy Rose was also questioned extensively regarding various distance measurements, particularly the driving distance between the Kinlou Road-O'Leary Road intersection and the trailer at 7914 O'Leary Road. Ultimately, Deputy Rose opined that the mileage description in the search warrant was relatively accurate and concluded that the driving distance from the intersection to the trailer at 7914 O'Leary Road was between three-quarters of a mile and a mile.

Deputy Ernie Clifton of the Marion County sheriff's department also testified at the suppression hearing. Deputy Clifton was involved in the execution of the search warrant. He testified that Deputy Rose led the other officers to the property where the trailer described in the warrant was located. Like Deputy Rose, Deputy Clifton claimed not to have noticed the trailer with no address on the day the warrant was

executed. He explained that, at the time, his attention was focused on the trailer at 7914 O'Leary Road. According to Deputy Clifton, there was not much foliage on the trees surrounding that trailer, because the search was conducted in December. Thus, Deputy Clifton was able to see it "even when [the officers] were coming down O'Leary Road" toward the property. Deputy Clifton, like Deputy Rose, testified that the driving distance between the Kinlou Road-O'Leary Road intersection and the trailer at 7914 O'Leary Road was between three-quarters of a mile and a mile.

Defendant Reynolds was the next to testify. She stated that she owned the trailer located at 7914 O'Leary Road, and that she lived there with her daughter and McCarty's son. According to Reynolds, she had purchased the trailer from McCarty's parents in 2000. Reynolds testified that she and McCarty were engaged. She stated that McCarty stayed at her trailer from time to time, sometimes every other weekend, sometimes as often as 10 times a month. She also stated that McCarty kept personal items at her trailer, that she did his laundry there, that McCarty had helped her complete various improvements on her property, and that McCarty was free to come and go as he pleased from her trailer.

Reynolds also described two of the other trailers. The trailer at 7910 O'Leary Road, she testified, was just south of hers and belonged to McCarty's father. She further testified that McCarty owned the trailer with no address. McCarty's sister and his brother-in-law, Reynolds said, had moved the trailer onto the property. She described the trailer as located on a slightly raised area next to a shed and barn. According to Reynolds, it still had a hitch, it was on wheels, and it had no underpinning. The trailer had no address, Reynolds stated, because it was not used as a residence and was, at present, basically abandoned.

McCarty's son also testified briefly. He confirmed that he lived at 7914 O'Leary Road with Reynolds. He also stated that his father stayed there sometimes.

Finally, McCarty testified. He claimed he did not reside at Reynolds' trailer at the time of the search, but rather that he moved back and forth between his father's trailer, his sister's trailer, and Reynolds' trailer. McCarty clarified that his sister lived in the trailer at 7912 O'Leary Road. With respect to the trailer with no address,

McCarty confirmed that he had purchased it from his sister and his brother-in-law. They had moved the trailer onto the property, he said, in October 2001, and he had bought it in November of the same year. McCarty admitted to being in Reynolds' trailer the morning of the search but denied spending the previous night there.

In denying defendants' motions to suppress, the circuit court concluded that Deputy Rose's and Deputy Clifton's testimony that they had not seen the trailer with no address was credible. The court also found credible Deputy Rose's testimony that he was familiar with the trailer described by the informant. In addition, the court accepted Reynolds' testimony that the trailer with no address was unoccupied and did not appear to be a residential dwelling, that McCarty's teenage son lived with her in the trailer at 7914 O'Leary Road, and that McCarty often stayed with her. The court did not consider Deputy Rose's mistake in recording the address of the trailer that was searched to be significant, because the warrant and the complaint did not describe the trailer by address, the addresses of the trailers were not in the usual ascending order, and the trailer was located in a rural area, which was accurately described in the complaint and the warrant. Resolving the factual discrepancies in favor of the State, the court found that the warrant was properly executed.

A circuit court's ruling on a motion to suppress presents both questions of law and fact. *People v. Smith*, 214 Ill. 2d 338, 347 (2005). The court's findings of historical fact will be upheld unless they are against the manifest weight of the evidence. *People v. Phillips*, 215 Ill. 2d 554, 566 (2005). The ultimate determination whether the evidence should have been suppressed based on the findings of fact is a question of law and is reviewed *de novo*. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). We turn now to defendants' challenges to the constitutionality of the warrant.

### A. Particularity of Description of Place to Be Searched

We first address whether the warrant described the place to be searched with sufficient particularity. Defendants argue that the warrant failed to describe the place to be searched with sufficient particularity because the trailer searched was not Roger McCarty's, it was not the "third" trailer east of O'Leary Road, and it was not three-quarters of a mile from the intersection of Kinlou Road and O'Leary

Road. In response, the State contends that the suppression hearing testimony demonstrated that McCarty resided at the trailer, that the trailer was either the third one on the private drive connected to O'Leary Road or the trailer Deputy Rose believed to be the third, and that, in any case, Deputy Rose knew which trailer was being described by the informant and went to that trailer when executing the warrant. Parenthetically, we note that defendants do not differentiate between the particularity of the warrant's description of the trailer and the particularity of the warrant's description of the camper. The clear implication of their position, however, is that the lack of particularity in the description of the trailer renders the entire warrant unconstitutional. *Cf. People v. McCoy*, 135 Ill. App. 3d 1059, 1067 (1985) ("[I]t is generally held that partial invalidity of a search warrant does not taint the whole warrant. [Citation.] A court will just sever the tainted part from the rest of the warrant. [Citation.]") Here, we need express no opinion on whether the warrant's description of the camper is severable from its description of the trailer, because as we shall explain, the latter was sufficiently particular.

A search warrant's description is sufficient if it enables the officer executing the warrant, with reasonable effort, to identify the place to be searched. *People v. Watson*, 26 Ill. 2d 203, 206 (1962); *Steele v. United States*, 267 U.S. 498, 503, 69 L. Ed. 757, 760, 45 S. Ct. 414, 416 (1925) ("It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended"). This case does not involve a warrant that is deficient on its face. See, *e.g.*, *People v. Redmond*, 43 Ill. App. 3d 682, 682-83 (1976) (warrant said place to be searched was ground level apartment, but also described it as being reached by going up 12 steps). Rather, it involves a situation where the execution of a facially valid warrant revealed facts that called into question the precision of the warrant's description of the place to be searched. Here, we cannot say that the degree of imprecision that became apparent in retrospect with respect to the execution of the warrant was so great as to render the warrant's description unconstitutionally vague. In other words, based on the totality of the circumstances surrounding the execution of the warrant, we cannot conclude that it did not set forth as sufficiently as possible a description which would enable a police officer using reasonable efforts to identify the area to be searched

with the requisite degree of certainty. See *People v. Curry*, 56 Ill. 2d 162, 171 (1973).

In this case, the warrant did not list the specific postal address of the premises to be searched. Therefore, the confusion that occurred regarding the addresses of the various trailers subsequent to the execution of the warrant is inapposite. Instead, the warrant described the location to be searched with respect to three factors: (1) the identity of an individual, (2) the approximate mileage between an intersection and the property on which the trailer to be searched was located, and (3) the position of that trailer in relation to other trailers.

The description was accurate with regard to the first factor, as it is undisputed that McCarty stayed regularly at the trailer that was searched, kept personal belongings there, and came and went from it as he pleased. Furthermore, McCarty's son lived there. Thus, while McCarty did not hold title to the trailer, he did exhibit numerous indicia of permanent occupancy.

The description's reference to the second factor was similarly accurate. As the warrant noted, the three-quarters of a mile distance measurement was an approximation. This approximation was sufficiently specific to direct the officers executing the search warrant to the property on which the particular trailer to be searched was located, as it is undisputed that driving three-quarters of a mile south from the Kinlou Road-O'Leary Road intersection would, at a minimum, place an individual at the beginning of the private drive and, at a maximum, place him at the doorstep of the trailer that was searched.

Finally, the description's reference to the third factor, the position of the trailer searched in relation to the other trailers, was also accurate. There unquestionably were four trailers located alongside the private drive. However, only three of those trailers were inhabited, and the appearance of the trailer that was not stood in marked distinction to the appearances of those that were. The uninhabited trailer still had wheels and a hitch, and it lacked underpinning. It was also positioned on a slight incline adjacent to a farm building. Furthermore, the testimony at the suppression hearing indicated that all of the other trailers were visible *prior to* the uninhabited trailer upon approaching the property from the Kinlou Road-O'Leary Road intersection.

In cases such as this one, where the particularity of a warrant is called into question only upon its execution, and where the extent of the warrant description's inaccuracy is minimal, courts generally are "receptive to a showing that the executing officer had some other information ***, via the warrant affidavit or otherwise, which made it apparent which place was intended." 2 W. LaFave, Search & Seizure §4.5(a), at 570 (4th ed. 2004). We believe this to be a sensible approach and therefore make note in this case of the fact that Deputy Rose, the officer in charge of executing the warrant, had served papers at the trailer that was searched on a previous occasion and was therefore familiar with its location. See also *People v. Burmeister*, 313 Ill. App. 3d 152, 158 (2000) ("Inaccuracies will not necessarily invalidate a warrant if the officer applying for the warrant also executed the warrant"). This factor, coupled with those discussed above, persuades us to conclude that the warrant's description of the premises to be searched was sufficiently particular.

### B. Particularity of Description of Items to Be Seized

We next address whether the warrant described the items to be seized with sufficient particularity. It is well established that, in a search warrant, "[a] minute and detailed description of the property to be seized is not required." *People v. Prall*, 314 Ill. 518, 523 (1924); see also *People v. Batac*, 259 Ill. App. 3d 415, 420 (1994); *People v. Allbritton*, 150 Ill. App. 3d 545, 546 (1986). Rather, "the property must be so definitely described that the officer making the search will not seize the wrong property." *Prall*, 314 Ill. at 523; see also *Batac*, 259 Ill. App. 3d at 420; *Allbritton*, 150 Ill. App. 3d at 546. Generally, "when property of a specified nature is to be seized rather than particular property then a description of its characteristics is sufficient." *Curry*, 56 Ill. 2d at 171, citing *Prall*, 314 Ill. at 523.

Here, the warrant described the items to be seized as "methamphetamine[,] records of drug transactions[,] drug paraphernalia[,] and United States currency." The warrant thus was not directed at particular property, but rather at items associated with the use, manufacture, and distribution of methamphetamine—items which, as the appellate court noted in Reynolds' appeal, "are easily identified as contraband by a trained officer." *Reynolds*, 358 Ill. App. 3d at 295; see also *United States v. Wicks*, 995 F.2d 964, 973-74

˘30˘

(10th Cir. 1993) (collecting cases in which general descriptions of drug-related items in warrants were deemed sufficiently particular). Furthermore, defendants have provided us with no indication that it would have been possible to provide a more precise description of the items to be seized at the time the warrant was issued. *Cf. People v. Capuzi*, 308 Ill. App. 3d 425, 432-33 (1999) (particularity of description insufficient where property to be seized consisted of items stolen in robbery and officer who obtained warrant could have, but did not, utilize additional information collected during investigation to provide more detailed description of items). Accordingly, we conclude that the warrant described the items to be seized with sufficient particularity.

## C. Sufficiency of Probable Cause

Finally, we turn to defendants' contentions regarding the alleged "overbreadth" of the warrant. Defendants use this term and variations of it liberally, and not always consistently, throughout their supplemental briefs. Generally, however, we understand them to argue that insufficient probable cause supported the warrant's authorization to search certain places and individuals. Thus, before addressing defendants' particular arguments, we review the principles relevant to evaluating probable cause.

Whether probable cause exists in a particular case depends on the totality of facts and circumstances known to an affiant applying for a warrant at the time the warrant is sought. *People v. Free*, 94 Ill. 2d 378, 400 (1983). Thus, the existence of probable cause in a particular case means simply that the totality of the facts and circumstances within the affiant's knowledge at that time "was sufficient to warrant a person of reasonable caution to believe that the law was violated and evidence of it is on the premises to be searched." *People v. Griffin*, 178 Ill. 2d 65, 77 (1997). Accordingly, the probable cause requirement is "rooted in principles of common sense." *People v. Hickey*, 178 Ill. 2d 256, 285 (1997). The issuing magistrate's task " 'is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Hickey*, 178 Ill. 2d at

285, quoting *Illinois v. Gates*, 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332 (1983). In light of these considerations, a reviewing court must not substitute its judgment for that of the magistrate in construing an affidavit. *People v. Stewart*, 105 Ill. 2d 22, 49 (1984). Rather, the court must merely decide whether the magistrate had a " 'substantial basis' " for concluding that probable cause existed. *Stewart*, 105 Ill. 2d at 49, quoting *Massachusetts v. Upton*, 466 U.S. 727, 732-33, 80 L. Ed. 2d 721, 727, 104 S. Ct. 2085, 2088 (1984).

Defendants briefly suggest that the warrant in this case was overly broad because the complaint did not establish probable cause to search the camper, given that the informant did not claim he actually saw the camper. Initially, we note that a sworn complaint supporting a search warrant is presumed valid (*People v. Martine*, 106 Ill. 2d 429, 435 (1985), quoting *Franks v. Delaware*, 438 U.S. 154, 171, 57 L. Ed. 2d 667, 682, 98 S. Ct. 2674, 2684 (1978)), and here, defendants have not challenged the veracity of the statements in the complaint. Thus, for purposes of this appeal, we view those statements as true. See, *e.g.*, *People v. Gardner*, 121 Ill. App. 3d 464, 467 (1984). Accordingly, defendants' argument is belied simply by a "commonsense and realistic" (*Griffin*, 178 Ill. 2d at 77; *Stewart*, 105 Ill. 2d at 49, quoting *United States v. Ventresca*, 380 U.S. 102, 108, 13 L. Ed. 2d 684, 689, 85 S. Ct. 741, 746 (1965)) reading of the complaint. The complaint describes one of the places to be searched as "a camper located in the woods east of the trailer" and alleges that "McCarty had more methamphetamine *** at this location." Surely, in this context, the "location" to which the complaint refers can be considered to encompass the trailer and the camper, and the fact the informant knew McCarty had more methamphetamine at the trailer and the camper supports the inference that the informant saw the camper. In addition, seeing the camper was not the only basis for the informant to develop probable cause to believe McCarty was engaging in illegal activity there. As the complaint states, McCarty admitted to manufacturing methamphetamine on the described premises. Therefore, defendants' argument that there was insufficient probable cause to support the warrant's authorization to search the camper is without merit.

Defendants also claim that the warrant was overly broad because the complaint did not establish probable cause to seize "United States

currency" and "drug paraphernalia." The use of methamphetamine alleged in the complaint, they argue, does not necessarily involve either of the above. Again, reading the complaint in a "commonsense and realistic" manner (*Griffin*, 178 Ill. 2d at 77; *Stewart*, 105 Ill. 2d at 49, quoting *Ventresca*, 380 U.S. at 108, 13 L. Ed. 2d at 689, 85 S. Ct. at 746), we disagree with defendants' interpretation of it. Despite defendants' assertion to the contrary, we do not think it at all uncommon for the use of a substance such as methamphetamine to involve drug paraphernalia. Moreover, the complaint supports a finding of probable cause to believe McCarty was engaging in the manufacture of methamphetamine, not simply its use, and it is reasonable to infer that the manufacture of methamphetamine could eventually result in its sale, which involves the exchange of currency.

Defendants further claim that the warrant was overly broad because it allowed the search and seizure of all "occupants" of the location described in the warrant even though the complaint only identified McCarty as the user and manufacturer of methamphetamine. This argument is problematic for a number of reasons. Initially, we note that an individual cannot complain about the violation of another's fourth amendment rights, because such rights are personal and may not be asserted vicariously. *People v. James*, 118 Ill. 2d 214, 226 (1987); *Alderman v. United States*, 394 U.S. 165, 174, 22 L. Ed. 2d 176, 187, 89 S. Ct. 961, 966-67 (1969). Thus, to the extent the warrant authorized the search of Allen Keen and Rita Smith, defendants have no standing to complain.

Furthermore, defendants have failed to explain how qualifying as "occupants" of the property within the meaning of the warrant violated their own fourth amendment rights. Defendants correctly note that in *Ybarra v. Illinois*, 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979), the United States Supreme Court held that independent probable cause is required before police can validly search a person who is present at a place being searched under a warrant, but who is not named in the warrant. *Ybarra*, 444 U.S. at 91, 62 L. Ed. 2d at 245, 100 S. Ct. at 342. However, there is no evidence in the record indicating that either McCarty or Reynolds was searched when the officers arrived at the trailer to execute the warrant, and thus no basis for concluding that the warrant was

utilized in violation of *Ybarra*. The record does show that McCarty and Reynolds were detained while the officers were executing the warrant and placed under arrest after the officers discovered evidence of methamphetamine manufacturing on the premises. Neither defendant, however, has argued that his or her detention or subsequent arrest was justified solely by his or her designation as an "occupant[ ]" under the warrant. *Cf. People v. Edwards*, 144 Ill. 2d 108, 126 (1991) ("For fourth amendment purposes, a warrant to search for contraband, founded on probable cause, implicitly carries with it the authority to detain occupants of the premises while the search is being conducted. [Citation.] If, in the course of the search, evidence establishing probable cause to arrest one or more of the occupants of the house is found, an arrest and a search incident thereto are constitutionally permissible. [Citation.]"), citing *Michigan v. Summers*, 452 U.S. 692, 705, 69 L. Ed. 2d 340, 351, 101 S. Ct. 2587, 2596 (1981). Illinois courts " 'adhere to the rule requiring a defendant to establish the manner in which his constitutional rights have been violated before permitting him to challenge the validity of the search and seizure.' " *People v. Keller*, 93 Ill. 2d 432, 439-40 (1982), quoting *People v. McNeil*, 53 Ill. 2d 187, 192 (1972). Because defendants' status as "occupants" within the meaning of the warrant was superfluous, they lack standing on that basis to challenge the constitutionality of the warrant's authorization to search "occupants."

Defendants also argue that the warrant was overly broad because it allowed the search of all "motor vehicles" on the property absent a particularized finding of probable cause. As with the warrant's authorization to search "occupants" of the property, defendants lack standing to contest the constitutionality of the warrant's authorization to search "motor vehicles," because there is no indication in the record that any motor vehicles were, in fact, searched. *Keller*, 93 Ill. 2d at 439-40, quoting *McNeil*, 53 Ill. 2d at 192.

Finally, defendants argue that the warrant was overly broad because it permitted the search of all "outbuildings" on the property absent a particularized finding of probable cause. The record reveals that a shed next to the trailer was searched, and that the search disclosed a cylinder with a hose sticking out of it and an unspecified amount of anhydrous ammonia. Despite the discovery of this

evidence, McCarty has no standing to contest the constitutionality of the warrant's command to search "outbuildings," because there is no indication that any image of, or reference to, the items in the shed was used as evidence against McCarty at his trial. *Keller*, 93 Ill. 2d at 439-40, quoting *McNeil*, 53 Ill. 2d at 192. Reynolds, on the other hand, has standing to challenge the warrant's command to search "outbuildings," because the police report admitted into evidence at her trial referred to the items discovered in the shed. We find, however, that the informant's complaint was sufficient to support a finding of probable cause to search "outbuildings" of the trailer. The complaint alleged that McCarty admitted to manufacturing methamphetamine on the described premises, and it is a commonly known fact that the manufacture of methamphetamine requires the use of dangerous chemicals. This fact supports the inference that such chemicals likely would be stored somewhere other than the trailer. Accordingly, the warrant's authorization to search "outbuildings" was supported by probable cause.

## CONCLUSION

In light of the foregoing, we hold that, for purposes of section 401(a)(6.5)(D) of the Controlled Substances Act (720 ILCS 570/401(a)(6.5)(D) (West 2000)), "substance containing methamphetamine" includes the byproduct produced during the manufacture of methamphetamine. We further hold that section 401(a)(6.5)(D) does not violate the proportionate penalties clause (Ill. Const. 1970, art. I, §11) or the due process clause (Ill. Const. 1970, art. I, §2) of the Illinois Constitution. Finally, we hold that the search warrant at issue in this case did not violate the warrant clause of the Illinois Constitution (Ill. Const. 1970, art. I, §6) or the warrant clause of the United States Constitution (U.S. Const., amend. IV). Accordingly, we affirm the judgments of the appellate court.

*Appellate court judgments affirmed.*

JUSTICE BURKE took no part in the consideration or decision of this case.

JUSTICE FREEMAN, concurring in part and dissenting in part:

I join fully in sections I and II of the court's opinion and agree that defendants' convictions must be upheld. I do not agree, however, with section III of the opinion and dissent from that portion of the opinion.

I part ways with my colleagues because I believe that the issue regarding the constitutionality of the search warrant was not adequately preserved by either defendant in this case and, as a result, should be deemed procedurally defaulted. The issue was not raised in either of the petitions for leave to appeal filed in this case. Failure to include an issue in a petition for leave to appeal results in its forfeiture. *People v. Carter*, 208 Ill. 2d 309, 318 (2003) (and cases cited therein). I also note that neither defendant raised the matter in his or her motion to suppress so the issue was not before the circuit court either. Defendant McCarty also failed to raise the issue in a posttrial motion. This court has long recognized that in order to preserve an issue for appellate review, the matter must be objected to at the time of trial *and* must also be included in the posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

The court acknowledges all of the above (slip op. at 22) and states that the issue has been forfeited. The court, however, excuses the forfeiture in light of two considerations plus the fact that "the rule of forfeiture is 'an admonition to the parties and not a limitation on the jurisdiction of this court.' " Slip op. at 23, quoting *People v. Normand*, 215 Ill. 2d 539, 544 (2005). I disagree with this analysis.

The first consideration cited by the court is the fact that "the appellate court reviewed McCarty's and Reynolds' challenges to the constitutionality of the warrant on the merits." Slip op. at 22. I fail to see how this is dispositive particularly when it is clear that the appellate court reached the issues by sidestepping the procedural-default argument raised by the State. Indeed, in defendant Reynolds' appeal, the appellate court did not even address the fact that the issue was defaulted. In the McCarty appeal, the appellate court noted the default, but addressed the matter on the sole basis that the "waiver rule is a limitation on the parties and not on the reviewing court." *McCarty*, 356 Ill. App. 3d at 560. The appellate court also stated that

it would "relax the rule" in the "interests of justice" and address the merits. *McCarty*, 356 Ill. App. 3d at 560. I note that the principle that "waiver is a limitation on the parties and not the court" has its origins in the notion that courts will override concerns of waiver in some cases if necessary to reach a just result or maintain a uniform body of precedent. See *Hux v. Raben*, 38 Ill. 2d 223, 225 (1967) (noting limited exceptions for addressing points not raised properly). Thus, the proposition is one that is dependent on a very limited number of circumstances being present in a given case. Here, the appellate court did not identify why the need to invoke this very limited exception existed in this case. Indeed, it would have been hard-pressed to do so, given that the case law in this area is both sound and uniform. As far as the interests of justice are concerned, it seems unlikely that those interests were much at risk given the appellate court's ultimate conclusion that no error occurred. For this reason, nothing about the appellate court's treatment of the issue gives this court any reason to address the issue on the merits. Thus, in contrast to my colleagues, I do not believe that the appellate court's decision to ignore the procedural default in this case limits this court from applying the doctrine.

The second consideration cited by the court is the fact that this court "granted McCarty and Reynolds leave to file supplemental briefs addressing the constitutionality of the warrant." Slip op. at 22-23. This is a reference to developments which arose when defendant McCarty sought leave to file a supplemental *pro se* brief in this case on February 9, 2006.[3] In the motion, McCarty alleged that his attorney had filed a petition for leave to appeal on one issue and that he [McCarty] "was allowed to file a Supplemental Petition for Leave to Appeal on a separate issue." McCarty claimed that the brief filed by his counsel did not include the issue raised in his supplemental

---

[3]McCarty's action in this court commenced on April 25, 2005, when his counsel filed a petition for leave to appeal on McCarty's behalf. His case was subsequently consolidated with that of defendant Reynolds upon this court's acceptance of both petitions on September 29, 2005. Thereafter, defendants' brief was filed on November 1, 2005, and the State's brief was filed on February 2, 2005.

petition. He therefore requested leave from this court to file a *pro se* supplemental brief as to that issue. Neither the motion nor the supplemental brief was ever served on the State, which became aware of the development only upon receipt of this court's order, entered by a single justice, allowing McCarty's *pro se* request.[4] Although this court, again by order of a single justice, subsequently denied its emergency motion for reconsideration, the State was given an opportunity to respond to McCarty's *pro se* supplemental brief. In its response, the State maintained that the issue was procedurally defaulted because it had not been properly preserved. The State also maintained that McCarty did not argue that the plain error rule excused the default nor could the rule be satisfied.[5]

Having now had a full opportunity to review both McCarty's motion and the full briefing of this matter in light of the complete record in this case, I believe the order which initially allowed McCarty leave to file a *pro se* supplemental brief was entered under a misapprehension of the facts. Contrary to McCarty's allegations in his motion for leave to file the supplemental brief, this court *did not allow* him to file a *pro se* supplemental petition. The docket sheet in this case indicates that no supplemental *pro se* petition was ever filed

---

[4]On March 13, 2006, defendant Reynolds also sought leave to file a supplemental brief with respect to the warrant issue. As was the case with McCarty's motion, leave was granted to Reynolds by order of a single justice.

[5]The State's response with respect to the warrant issue was not filed in this court until after oral argument had been conducted. In fact, full briefing on the warrant issue was not completed until May 3, 2006, almost two months after oral argument

in this court. This is not surprising since a defendant does not have the right to both self-representation and the assistance of counsel. *People v. McDonald*, 168 Ill. 2d 420, 435 (1995) (and cases cited therein); *People v. Woods*, 292 Ill. App. 3d 172, 179 (1997). In light of these facts, I do not believe any reason exists for this court to consider this argument, particularly in light of the fact that the record indicates that the issue was never properly preserved in the first place by either McCarty or defendant Reynolds.

In my view, neither the fact that the appellate court addressed the claim on the merits nor the fact that this court sought supplemental briefing on the issue operates to excuse the procedural default that is present in this case. The latter argument is particularly unpersuasive since in the course of the full supplemental briefing that this court allowed, the State raised a plain error argument to which neither defendant has responded. I note that, in the past, this court has refused to entertain arguments when a defendant fails to ask the court to review the matter under the doctrine of plain error. See, *e.g.*, *People v. Williams*, 204 Ill. 2d 191, 208 (2003); *People v. Casillas*, 195 Ill. 2d 461, 485 (2000); *People v. Reed*, 177 Ill. 2d 389, 395 (1997). I fail to see why the defendants in this case should be treated differently solely on the basis that the court allowed additional briefing on this issue. I therefore next address whether the court's decision to excuse the bar in this case is somehow warranted "because the rule of forfeiture is 'an admonition to the parties and not a limitation on the jurisdiction of this court.' " Slip op. at 23, quoting *People v. Normand*, 215 Ill. 2d 539, 544 (2005).

As noted previously, the principle that waiver is a limitation on the parties and not the court can be traced to this court's decision in *Hux*, in which this court stated courts of review may override concerns of waiver in some cases if necessary to reach a just result or maintain a uniform body of precedent. *Hux*, 38 Ill. 2d at 225. I do not disagree with this basic premise. However, the principle does not, in my view, give a court of review *carte blanche* to disregard a claim of procedural default without some expressed justification that comports with the rationale upon which *Hux* decided. In this case, neither the need to maintain a uniform body of precedent nor the need to reach a just result is strong enough to override the well-recognized concerns

that animate the doctrine of procedural default. As I noted previously, the case law in this area is unremarkable, and the need to ensure a just result is not at risk.

More importantly, however, I believe that the principle announced in *Hux* should not be invoked arbitrarily especially given the fact that well-defined exceptions to the waiver rule exist. Indeed, this court has developed a plain error doctrine which allows a reviewing court to reach a forfeited error in certain circumstances. The doctrine, adopted formally as Supreme Court Rule 615, serves as " 'narrow and limited exception to the general *** rule [of procedural default].' " *People v. Szabo*, 113 Ill. 2d 83, 94 (1986), quoting *People v. Pastorino*, 91 Ill. 2d 178, 188 (1982). Under this doctrine, a default will be excused if the defendant can establish plain error, in that either (i) the evidence was closely balanced such that the error was prejudicial or (ii) the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process such that prejudice can be presumed. *People v. Nitz*, 219 Ill. 2d 400, 414-15 (2006).[6]

---

[6]I will leave to another day discussion of the interrelationship, if any, between the principle rooted in *Hux* and this court's plain error rule. For example, why are some criminal defendants made to satisfy the plain error

rule in order to have a default excused (see, *e.g.*, *People v. Allen*, No. 99977 (June 2, 2006) (holding defaulted the defendant's due process challenge to the circuit court's erroneous decision to restrain him, during trial, in an electronic stun belt due to defendant's failure to satisfy either prong of the plain error rule)) while other criminal defendants, such as those today, have their procedural defaults excused for no given reason? Although numerous decisions of this court invoke the *Hux* principle in criminal cases, a close reading of *Hux* suggests that such reliance may be erroneous, as the opinion seems to indicate that the principle applies only in civil cases. See *Hux*, 38 Ill. 2d at 224 (noting distinction between the principle and the "similar thought \*\*\* expressed in the provision of Rule 615 *with respect to the review of criminal cases*" (emphasis added)). If that is so, then the only vehicle by which this court could excuse the procedural bar in this case would be the plain error rule.

The foregoing leads me to believe that the court's inconsistent application of the doctrine of procedural default will continue to produce opinions which cannot be harmonized with each other. The indiscriminate application of the principle enunciated in *Hux* will serve only to prompt defendants to raise even more procedurally defaulted claims on appeal. The State, relying on our precedent that an issue must be properly preserved by a contemporaneous objection as well as in the posttrial motion, will be left to wonder if procedural default and plain error are still viable arguments to make in this court given the wholly inconsistent manner in which they are applied. This is not an unrealistic prediction because, to put it frankly, it is difficult to try to moor this court's application of the doctrine of procedural default to any objective criteria. Rather, opinions such as today's serve only to give the appearance that the court does whatever it wants to do in any given case, whether it be excusing forfeitures on the basis of *Hux* in one case while strictly applying the plain error rule in another.

That said, I would invoke the principle that "waiver is a limitation on the parties and not on the court" only in the limited instances explicitly contemplated in *Hux*. In contrast to my colleagues, I do not believe that principle has any application to this case. Instead, I would hold that the issue has been procedurally defaulted and that no reason exists to excuse the procedural default. See *People v. Keene*, 169 Ill. 2d 1 (1995) (setting forth bases for excusal of procedural default); *People v. Enoch*, 122 Ill. 2d 176 (1988) (same).

JUSTICE KILBRIDE joins in this partial concurrence and partial dissent.