# Illinois Official Reports

## Appellate Court

---

### *People v. Jones*, 2020 IL App (3d) 170674

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EMANUEL W. JONES, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-17-0674 |
| Filed | April 13, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 16-CF-727; the Hon. Kevin Lyons, Judge, presiding. |
| Judgment | Reversed in part, vacated in part, and remanded for further proceedings. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and James Wozniak, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Jodi Hoos, State's Attorney, of Peoria (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE O'BRIEN delivered the judgment of the court, with opinion. Presiding Justice Lytton and Justice McDade concurred in the judgment and opinion.

**OPINION**

¶ 1    After being charged with offenses relating to his possession of cocaine, defendant, Emanuel W. Jones, filed a motion to quash a search warrant and suppress evidence. That motion was ultimately denied, and defendant was found guilty following a stipulated bench trial. On appeal, he argues that the Peoria County circuit court's denial of his motion to quash the search warrant and suppress evidence was in error. We reverse the court's ruling on defendant's motion to quash the search warrant and suppress evidence, vacate defendant's conviction for unlawful possession of a controlled substance with intent to deliver, and remand the matter for further proceedings.

¶ 2                               I. BACKGROUND

¶ 3    The State charged defendant by indictment with unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(A) (West 2016)) and unlawful possession of a controlled substance (*id.* § 402(a)(2)(A)). Both counts originally alleged that defendant possessed more than 15 grams of cocaine. The State would later add two charges via indictment, charging lesser versions of those offenses based on the allegation that defendant possessed between 1 and 15 grams of cocaine. *id.* § 401(c)(2) (possession with intent to deliver); *id.* § 402(c) (possession).

¶ 4    Defendant subsequently filed a motion to quash search warrant and suppress evidence illegally seized. In the motion, defendant alleged that the search warrant in the case was "bare bones" in nature and therefore lacked the probable cause required for its issuance.

¶ 5    The complaint for search warrant was filed on September 24, 2016, by Jared Fuller of the Peoria County Sherriff's Office. The complaint requested a search warrant for the premises located at 3003 West Proctor Street in Peoria, as well as for defendant's person. Fuller, a member of the Multi-County Narcotics Enforcement Group, averred that he expected to find cocaine, currency, paraphernalia, and other evidence of possession with intent to deliver. He continued:

> "Complainant states that he does believe that the above listed items to be seized will be located on the premises described above, because on at least two occasions the complainant has caused the confidential source (C/S) to arrange for the purchase of crack cocaine from [defendant]. On each occasion [defendant] was observed leaving the above described residence and delivering crack cocaine to the C/S. The following facts describe such:
>
> The first occasion, I caused a reliable confidential source to arrange the purchase of crack cocaine from [defendant]. Agents met with the C/S at a pre-determined location and provided the C/S with $60.00 USC/OAF. Agents followed the C/S to the pre-determined buy location, Peoria, IL (observed entire time driving). Agents observed [defendant] leave the residence of 3003 W. Proctor St, Peoria, IL. [Defendant]

was observed entering the driver seat of his vehicle and drive and meet the C/S. [Defendant] drove directly to the C/S (observed the entire time). [Defendant] exited his vehicle and met the C/S through the front passenger seat of the C/S vehicle for a brief time. [Defendant] then entered his vehicle and drove away. The C/S drove to a pre-determined meet location to meet with Agents (observed entire time driving). The C/S gave me 0.48 grams of crack cocaine that was purchased with $60.00 USC/OAF. The C/S advised [defendant] arrived in his vehicle and exited. The C/S said [defendant] handed him/her the 0.48 grams of crack cocaine in exchange for the $60.00 USC/OAF. The crack cocaine was field tested with positive results for cocaine. The C/S was searched before and after the transaction and no illegal contraband was located.

The second occasion, with the last 72 hours, I again caused the same reliable confidential source to arrange for the purchase of crack cocaine from [defendant]. Agents met with the C/S at a pre-determined location and provided the C/S with $40.00 USC/OAF. Agents followed the C/S to the predetermined buy location [in] Peoria, IL (observed entire time driving). Agents observed [defendant] leave the residence of 3003 W. Proctor St, Peoria, IL. [Defendant] was observed to walk North through the yards to meet with the C/S at the buy location (observed the entire time). [Defendant] was observed entering the front passenger seat of the C/S vehicle. The C/S then drove a very short distance and [defendant] exited the C/S vehicle. [Defendant] was then observed walking back to the residence of 3003 W. Proctor St, Peoria, IL. The C/S drove to a pre-determined meet location to meet with Agents (observed the entire time driving). The C/S gave me 0.46 grams of crack cocaine that was purchased with $40.00 USC/OAF. The C/S advised [defendant] arrived on foot and entered the front passenger seat of the C/S vehicle. The C/S said [defendant] had him/her drive a very short distance. The C/S said [defendant] handed him/her the 0.46 grams of crack cocaine in exchange for the $40.00 USC/OAF. The C/S advised [defendant] then exited the C/S vehicle and walked away. The crack cocaine was field tested with positive results for cocaine. The C/S was searched before and after the transaction and no illegal contraband was located."

The complaint went on to attest to the basis for the reliability of the confidential source. It also detailed Fuller's experience in narcotics trafficking and investigation. Fuller explained his awareness that drug traffickers often maintain, *inter alia*, "additional amounts of narcotics at their residences or other safe places for future sales."

¶ 6 A hearing was held on the motion on December 15, 2016. The State argued that the complaint was sufficient to establish probable cause in part because "defendant was observed directly leaving his house and going to the location of the drug sale." The State also asserted that the investigating officers otherwise acted in good faith in relying upon the search warrant.

¶ 7 In issuing its ruling, the court observed that defendant had exited from and returned to his home before and after a drug sale. It commented: "There was no information about why the Court or officer would think that drugs are in the home other than he has left his home and made a transaction on the street." The court granted defendant's motion, finding that the complaint for search warrant had been "bare bones."

¶ 8 The State filed a motion to reconsider. In the motion, the State urged that even if the complaint for search warrant was insufficient, the good faith exception to the exclusionary rule should apply, such that the evidence seized in the case should not be suppressed at trial.

- 3 -

¶ 9 Following a hearing on the motion, the court reiterated that the complaint had been bare bones, as it contained no nexus between defendant's conduct and the potential for additional drugs to be found in the house. The court found, however, that the warrant had nevertheless been reasonably relied upon. It therefore found that the good faith exception applied and reversed its previous ruling on the motion to quash search warrant and suppress evidence.

¶ 10 Defendant proceeded by way of a stipulated bench trial. The stipulated evidence contained multiple references to 3003 West Proctor Street as defendant's home or residence. The court found defendant guilty of unlawful possession with intent to deliver between 1 and 15 grams of cocaine and sentenced defendant to an agreed term of five years' imprisonment.

¶ 11 II. ANALYSIS

¶ 12 On appeal, defendant argues that the court's ultimate denial of his motion to quash search warrant and suppress evidence was erroneous. He maintains that the complaint for a search warrant failed to establish the probable cause required for its issuance. He also argues that the complaint was so insufficient that the good faith exception to the exclusionary rule may not be applied.

¶ 13 A. Probable Cause

¶ 14 The United States and Illinois Constitutions both require "that searches and seizures must be reasonable and that probable cause must support search warrants." *People v. Manzo*, 2018 IL 122761, ¶ 28. In determining whether probable cause exists to support a search warrant, a court must make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [it] ***, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

¶ 15 A court of review will not substitute its own judgment for that of the court that previously issued a search warrant. *People v. McCarty*, 223 Ill. 2d 109, 153 (2006). Rather, this court need only decide whether the warrant-issuing court had a "substantial basis" for concluding that probable cause existed. (Internal quotation marks omitted.) *Id.* A court of review will not defer to a warrant premised on a complaint that does not provide a substantial basis for probable cause. See *People v. Sutherland*, 223 Ill. 2d 187, 219 (2006).

¶ 16 The facts in the present case are strikingly similar to those set forth in our supreme court's recent decision in *Manzo*, 2018 IL 122761. We find *Manzo* to be highly relevant here, nearly to the point of being controlling. Accordingly, our analysis must begin with a discussion of the court's opinion in that case.

¶ 17 The complaint for search warrant in *Manzo* was targeted at Ruben Casillas, a black Ford Explorer, and the residence at 701 West Marion Street in Joliet. *Id.* ¶ 4. The defendant was not named in the complaint, but lived at that residence with Leticia Hernandez, Casillas's cousin. *Id.* In the complaint, the swearing officer explained that he had purchased cocaine from Casillas three times in the prior 20 days, including twice "in the vicinity of 701 West Marion Street." *Id.* ¶ 5.

¶ 18 Casillas arrived at the first of the three transactions in a black Ford Explorer that was registered to Hernandez. *Id.* ¶ 6. While an officer was texting Casillas to arrange the third transaction, other officers observed Casillas leaving the residence at 701 West Marion Street and proceeding directly to the arranged meeting location. *Id.* ¶ 8. The complaint included an

allegation that law enforcement records showed Casillas to be "an associate of Leticia Hernandez who resided at 701 West Marion Street in Joliet." *Id.* ¶ 9. The warrant judge issued the warrant. *Id.* ¶ 10. The circuit court denied the defendant's motion to quash the search warrant. *Id.* ¶¶ 18-19.

¶ 19 Our supreme court found that there was no substantial basis to conclude that probable cause existed to believe that contraband would be found in the residence.[1] *Id.* ¶ 61. The court found that the facts found in the complaint failed "to establish a sufficient nexus between Casillas's criminal activities and the residence at 701 West Marion Street," in part because insufficient details connecting Casillas to Hernandez—and thus, the residence—had been provided. *Id.* ¶ 39. The court also rejected the notion that the proximity of the residence to the first two transactions supported an inference that the residence was a reasonable place for Casillas to store drugs. *Id.* ¶¶ 42-43. To that point, the court wrote:

"No evidence was presented that defendant lived at 701 West Marion Street, nor was there evidence that Casillas was a frequent visitor to 701 West Marion Street. Casillas was seen at 701 West Marion Street one time. The affidavit did not specify defendant's legal address, although the complaint stated that Officer Harrison had identified Casillas from his Illinois Secretary of State driver's license. It is possible Casillas also lived in the neighborhood and, for that reason, was familiar with the area." *Id.* ¶ 43.

¶ 20 Especially relevant to the instant matter, the State in *Manzo* insisted that the fact that Casillas left the residence at 701 West Marion Street and proceeded directly to the third transaction served to support the inference that additional drugs were stored at the residence. *Id.* ¶ 47. In rejecting that inference, the court wrote:

"The three drug sales took place over a period of 19 days. With regard to the third drug sale, there was no evidence indicating how long Casillas had been at defendant's home before he left the home and walked to the drug sale. While Casillas apparently had the drugs on his person when he left 701 West Marion Street to meet Officer Harrison for the third drug sale, it does not follow that Casillas obtained those drugs from defendant's home as opposed to any other place. Without more information connecting defendant's home to the drug sale, it is equally possible to infer that Casillas had the drugs on his person when he arrived at defendant's home." *Id.* ¶ 48.

¶ 21 Finally, the State in *Manzo* contended that each of Casillas's deliveries to the undercover officer occurred on the same day as the officer's request. *Id.* ¶ 50. It maintained that this "ability to produce drugs soon after receiving a request for them suggests he has a ready supply and that a drug dealer who has participated in multiple drug sales is far likelier to have access to large quantities of drugs and other tools of the trade." *Id.* Again, the court rejected that argument. *Id.* ¶ 51. The court wrote:

"The facts and inferences as set forth in Officer Harrison's sworn complaint were more suggestive of an occasional sale than a full-scale drug operation, much less a drug operation run out of defendant's home. There was no allegation in the complaint that the amount of drugs sold to Officer Harrison was indicative of a large-scale drug operation, nor was there an allegation that Casillas was a known drug dealer. Even assuming Casillas had access to a ready supply of drugs, the sworn complaint fails to

---

[1]A divided panel of this court had affirmed the circuit court's denial of the motion to quash the search warrant. *People v. Manzo*, 2017 IL App (3d) 150264, ¶ 24.

create a nexus between defendant's home and that supply. There certainly was no evidence in the sworn complaint supporting an inference that defendant's home was a 'stash house.' " *Id.*

¶ 22    The complaint for a search warrant in the present case provides even *less* of a substantial basis for probable cause than did the facts in *Manzo*.

¶ 23    Among the biggest issues with the complaint in this case is the complete failure to establish the time that the first transaction occurred. While the complaint stated that the second transaction had occurred within the 72 hours prior to the filing of the complaint itself, all that is known of the first transaction is that it occurred at some unknown point in the past. The doctrine of staleness prevents law enforcement from relying upon old or outdated information in establishing probable cause. See *People v. Beck*, 306 Ill. App. 3d 172, 179 (1999) (" 'Staleness' refers to the amount of time that has elapsed between the facts alleged in the affidavit in support of the search warrant and issuance of the warrant."). Where simply no information is provided regarding when an activity took place, however, neither this court nor any other court is able to conduct a staleness analysis. Under these circumstances, it is difficult to ascribe *any* probative value to the first transaction. It could have happened the day before the second transaction. It could have happened a decade earlier.[2]

¶ 24    Also problematic is the lack of connection in the complaint between defendant himself and the residence at 3003 West Proctor Street. At no point does the complaint, either explicitly or implicitly, state that defendant lived at 3003 West Proctor Street. The complaint never even refers to that residence in the possessive, such as "defendant's residence" or "his residence." While the complaint explains that officers were observing defendant as he left the house, there is no explanation for how the officers knew he was there or how he came to be there. There was nothing in the complaint to indicate that defendant had anything more than a passing familiarity with the residence in question. At most—including the unknown-in-time first transaction—the complaint establishes that defendant has been to the residence at 3003 West Proctor Street twice in his life. See *Manzo*, 2018 IL 122761, ¶ 43 ("No evidence was presented that defendant lived at 701 West Marion Street, nor was there evidence that Casillas was a frequent visitor to 701 West Marion Street.").

¶ 25    To be sure, a judge issuing a search warrant is entitled to draw reasonable inferences from the complaint. *People v. Moser*, 356 Ill. App. 3d 900, 908 (2005). However, the complaint here contained no information from which that inference could be reasonably drawn. See Black's Law Dictionary 897 (10th ed. 2014) (defining inference as "[a] conclusion reached by considering other facts and deducing a logical consequence from them"). The conclusion that defendant lived at 3003 West Proctor Street would be nothing more than an assumption. We recognize that the stipulated trial evidence established that defendant did, in fact, live at the address in question. That fact, however, does not impact our analysis. "[P]robable cause exists in a particular case when the totality of the facts and circumstances within the affiant's knowledge *at the time the warrant is applied for*" allow a person of reasonable caution to believe contraband will be found on the premises in question. (Emphasis added.) *Manzo*, 2018

---

[2]We note that, in any event, defendant's entry into his vehicle prior to the first transaction tends to undermine the nexus between that transaction and the residence, as it raises the equal possibility that defendant kept drugs in the vehicle.

IL 122761, ¶ 29. If Fuller knew that defendant lived at 3003 West Proctor Street, he never conveyed that information to the court.

¶ 26     Next, the complaint in the present case contained no information concerning the passage of time between the arrangement of the drug transactions and their actual execution. In other words, once the confidential source arranged to purchase drugs from defendant, it is unknown whether weeks, days, hours, or mere moments passed before the confidential source actually met with defendant. Such a time frame would be highly relevant in potentially connecting defendant to the residence at 3003 West Proctor Street; the greater the passage of time between arrangement and execution, the greater the potential that defendant retrieved the drugs from any of innumerable places prior to leaving the residence to conduct the transaction. On that same point, the complaint fails to detail how long officers were positioned in surveillance on defendant at 3003 West Proctor Street.

¶ 27     Of course, that fact stands in stark contrast to the facts set forth in *Manzo*. In that case, the complaint stated that the transactions had occurred on the same day as the request for drugs. The State argued that that immediacy lended itself to an inference that Casillas had a "ready supply." *Id.* ¶ 50. Of course, the *Manzo* court rejected that argument: "Even assuming Casillas had access to a ready supply of drugs, the sworn complaint fails to create a nexus between defendant's home and that supply." *Id.* ¶ 51. Here there are no facts to imply that defendant had any such sort of "ready supply."

¶ 28     The crux of the State's argument, both on appeal and below, is that defendant twice left 3003 West Proctor Street to sell drugs and that must give rise to an inference that he kept his drugs there. But the *Manzo* court rejected such an inference. To reiterate, the *Manzo* court wrote:

> "[T]here was no evidence indicating how long Casillas had been at defendant's home before he left the home and walked to the drug sale. While Casillas apparently had the drugs on his person when he left 701 West Marion Street to meet Officer Harrison for the third drug sale, it does not follow that Casillas obtained those drugs from defendant's home as opposed to any other place. Without more information connecting defendant's home to the drug sale, it is equally possible to infer that Casillas had the drugs on his person when he arrived at defendant's home." *Id.* ¶ 48.

That same passage applies with equal force to the present case. The complaint contained no evidence indicating how long defendant had been at 3003 West Proctor Street prior to leaving to sell drugs. While defendant must have had the drugs on his person when he walked to the second transaction, it does not follow that he obtained those drugs from the residence as opposed to any other place. To be sure, we do not doubt that a sufficient pattern of leaving the same house to attend drug transactions may give rise to probable cause to search that house. Here, however, defendant left the residence in question one reliable time to sell drugs. See *supra* ¶ 24. This does not create a nexus between the drugs and that residence.

¶ 29     Finally, we note that the *Manzo* court's observation with regard to the amount of drugs sold also applies in this case. The *Manzo* court wrote:

> "The facts and inferences as set forth in Officer Harrison's sworn complaint were more suggestive of an occasional sale than a full-scale drug operation, much less a drug operation run out of defendant's home. There was no allegation in the complaint that the amount of drugs sold to Officer Harrison was indicative of a large-scale drug

operation, nor was there an allegation that Casillas was a known drug dealer." *Manzo*, 2018 IL 122761, ¶ 51.

In making its point, the *Manzo* court expressly adopted the view of the Sixth Circuit Court of Appeals: "[T]he sale of drugs out of a residence 'exists upon a continuum ranging from an individual who effectuates the occasional sale from his or her personal holdings of drugs to known acquaintances, to an organized group operating an established and notorious drug den.' " *Id.* (quoting *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006)).

¶ 30     Similarly, all that was established in this case was that defendant sold drugs one time recently, and another time in the unknown past. While the complaint did state that the two transactions were for 0.48 and 0.46 grams of crack cocaine, it did nothing to contextualize that information. Nor did the complaint allege that defendant was a known drug dealer. In short, as in *Manzo*, nothing in the complaint tended to establish that defendant was running a drug operation of the magnitude where he would be expected to have some sort of stored supply, as opposed to simply dealing out of his "personal holdings." See *Hython*, 443 F.3d at 485.

¶ 31     Our supreme court in *Manzo* found that a substantial basis for probable cause did not exist, and our determination can be no different here. However, our finding that there was not a substantial basis for probable cause supporting the search at 3003 West Proctor Street does not end our review. We must next consider whether the good faith exception to the exclusionary rule applies.

¶ 32                              B. Good Faith Exception

¶ 33     In *United States v. Leon*, 468 U.S. 897 (1984), the United States Supreme Court recognized a good faith exception to the exclusionary rule. Under this doctrine, evidence illegally seized need not be suppressed at trial where officers acted in good faith reliance on a search warrant that was subsequently found to have not been supported by probable cause. *Id.* at 922. The *Leon* Court also found that the good faith exception would be inapplicable where a search warrant was issued based on an affidavit or complaint " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " *Id.* at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part, joined by Rehnquist, J.)).

¶ 34     Illinois has codified the good faith exception in subsections 114-12(b)(1) and (b)(2) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-12(b)(1), (b)(2) (West 2016)). Section 114-12(b)(1) provides that a court should not suppress otherwise admissible evidence if a police officer seized that evidence in good faith. *Id.* § 114-12(b)(1). Section 114-12(b)(2)(i), in turn, defines good faith:

"(2) 'Good faith' means whenever a peace officer obtains evidence:

(i) pursuant to a search or an arrest warrant obtained from a neutral and detached judge, which warrant is free from obvious defects other than non-deliberate errors in preparation and contains no material misrepresentation by any agent of the State, and the officer reasonably believed the warrant to be valid[.]" *Id.* § 114-12(b)(2)(i).

¶ 35     Notably, the *Manzo* court held that the complaint in that case was so lacking as to fall outside the scope of the good faith exception. *Manzo*, 2018 IL 122761, ¶ 69 ("[W]e ***find that the affidavit in this case was bare-bones and failed to establish the required minimal nexus between defendant's home and the items sought in the search warrant."). The court observed

that the statements in the complaint were "completely devoid of facts to support Officer Harrison's judgment that probable cause to search defendant's home existed." *Id.*

¶ 36 As we have noted, the present complaint presented even less of a basis for probable cause than did the complaint in *Manzo*. The complaint here presented such a lack of indicia of probable cause that official belief in the existence of probable cause for the search was entirely unreasonable. *Leon*, 468 U.S. at 923. We therefore find the good faith exception inapplicable here.

¶ 37 In reaching this conclusion, we are compelled to point out that the complaint was, in the terms employed by the Code, not free from obvious errors. See 725 ILCS 5/114-12(b)(2)(i) (West 2016). In fact, the errors and omissions detailed above were fundamental in nature. The complaint failed to state defendant's relationship to the residence to be searched. It failed to detail how much time passed between arrangement of the drug deals and the execution. It failed to provide any significant details concerning defendant's actions before or after the transactions, which might tend to connect him to the residence. It failed to even state *when* one of the two transactions took place. These were not minor, technical errors or omissions. They were fundamental facts needed to establish a nexus between defendant and the residence. See *Manzo*, 2018 IL 122761, ¶ 69.

¶ 38 Where a search warrant is unsupported by probable cause, and the good faith exception to the exclusionary rule does not apply, the fruits of the search based on that warrant must be suppressed at trial. We therefore reverse the circuit court's ruling on defendant's motion to quash search warrant and suppress evidence. As a result, we also vacate defendant's conviction for unlawful possession of a controlled substance with intent to deliver and remand the matter for further proceedings. See *id.* ¶ 73.

¶ 39                                                    III. CONCLUSION

¶ 40 The judgment of the circuit court of Peoria County is reversed in part, vacated in part, and remanded for further proceedings.

¶ 41 Reversed in part, vacated in part, and remanded for further proceedings.